**PEKELIS v. TRANSCONTINENTAL & WESTERN AIR, Inc.**

No. 39, Docket 21690.

United States Court of Appeals Second Circuit.

Argued Nov. 10, 1950.

Decided Feb. 15, 1951.

Paul Weiss Wharton & Garrison, New
York City, Samuel J. Silverman, Martin
Kleinbard and Louis H. Pollak, all of New
York City, of counsel, for plaintiff-appel-
lant.

Haight, Deming, Gardner, Poor &
Havens, New York City, William J. Junker-
man and S. V. Silverthorne, Jr., New York
City, of counsel, for defendant-respondent.

Before AUGUSTUS N. HAND, CHASE
and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiff Pekelis individually and as
administratrix of the estate of her deceased
husband, Alexander H. Pekelis, brought
this action against the defendant Transcon-
tinental & Western Air, Inc., to recover
damages for the death of her husband, who
was killed on December 28, 1946, in an ac-
cident near Shannon, Eire, while a passen-
ger for hire on one of the defendant's
TWA's Lockheed Constellation airplanes.

The flight which forms the subject of the
action falls within the definition of "inter-
national transportation," as that term is de-
fined in a treaty known as the "Warsaw
Convention," to which both the United
States and Eire are signatories. The War-
saw Convention provided that the carrier
should not be liable if it proved that it and
its agents had taken "all necessary measures
to avoid the damage", or that it was im-
possible for it or them to take such meas-
ures. The treaty also provided that in the
transportation of passengers the liability
of the carrier, if any, for each passenger
was limited to the sum of $8,300. It further
provided, in Article 25, as follows:[1]

1. The above translation is from the text
of the Convention, which was in French,
and is the translation which was before
the United States Senate when it rati-
fied the treaty, as it appears at 49 U.S.
Stat. at L., Part 2, pp. 3014, et seq.

"(1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.

"(2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment."

There was a conflict in the evidence over the cause of the accident. The plaintiff contended that it was due to a faulty altimeter resulting from a mechanic's having intentionally omitted to perform a necessary safety test. The defendant contended that the circumstances under which the mechanic had acted were not such as to amount to "wilful misconduct." It also introduced evidence tending to show that the accident had happened through the misjudgment of the pilot in making the kind of turn he did to come into the runway of the airport. All these were plainly questions for the jury, and the plaintiff has not contended otherwise. She claims error by the trial judge (1) in excluding the European Regional Accident Investigation Board Report, the Maintenance Investigation Report, the International Division Accident Investigation Board Report, and the General Manager's Bulletin; (2) in excluding a letter written by Captain Sigman on January 9, 1947; (3) in refusing plaintiff's requests to charge as to definitions of "wilful misconduct or conduct equivalent thereto."

■ First, we shall deal with the refusals to grant the plaintiff's requests. The charge as to wilful misconduct was as follows:

"Now I shall try to define for you what is meant by 'wilful misconduct' in this case. It does not mean that the defendant, or any of its employees, had a deliberate intention to kill Alexander H. Pekelis, or to wreck this airplane. Wilful misconduct is the intentional performance of an act with knowledge that the performance of that act will probably result in injury or damage, or it may be the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences of the performance of the act.

"Likewise, the intentional omission of some act, with knowledge that such omission will probably result in damage or injury, or the intentional omission of some act in a manner from which could be implied reckless disregard of the probable consequences of the omission, would also be wilful misconduct.

    *    *    *    *    *    *

"If you determine that there was no such wilful misconduct, then you must stop right there and, for the reasons which I have explained to you a little earlier, you must bring in a verdict for the plaintiff for $8300 only.

"If, however, you find that the defendant, or any of its employees, committed one or more acts of wilful misconduct, then you must go on to consider whether or not such wilful misconduct as you have found was the proximate or legal cause of the death of Mr. Pekelis. Now, to be the legal cause of this result, namely, Mr. Pekelis' death, the wilful misconduct must be a substantial factor in bringing about that result. Furthermore, there must be an actual and continuous sequence connecting the act of wilful misconduct with the death of Mr. Pekelis.

"I say that the wilful misconduct must be a substantial factor in bringing about the death. You will note I did not say it must be the *sole* substantial factor contributing to the death. In other words, if you find that wilful misconduct by the defendant or any of its employees was a substantial contributing factor to the death of Mr. Pekelis, that is sufficient to sustain the plaintiff's claim, even though you may find that there were also other substantial contributing factors. * * *"

The plaintiff limited her objections to the charge to the failure to embody in it the requests she had made. The principal request relied on was Number 8. The other requests were either applications of the rule of law to the facts, or were essentially

a repetition of portions of the charge in different words. Number 8 read as follows: "A deliberate purpose on the part of the carrier or one of its employees not to discharge some duty necessary to safety may constitute wilful misconduct."

This request was properly denied because it failed to state that the employee must either have known that the test was necessary for safety, or his duty to make it must have been so obvious that in failing to make it his conduct would be reckless, rather than merely negligent.[2] We think these considerations were embodied in the charge which the judge gave.

■ We shall next refer to the exclusion of Captain Sigman's letter. After testifying for defendant as to the performance of the plane involved in the accident during flights shortly before the accident, he was questioned on cross-examination about a letter he had written, apparently by way of report to his superiors in TWA, which dealt with the behavior of the altimeter in a ship like the one involved in the accident. A copy of the letter did not refresh his recollection, whereupon the defendant's attorney called on the plaintiff to produce the original. After a colloquy with counsel at the bench, the court said: "Without inquiring further as to whether or not the letter is in court, pursuant to the subpoena or demand to produce, I now rule that even if the original letter were here I would not permit any further inquiry concerning it, because the matters which appear in the letter I deem to be irrelevant to the issues in this case."

The plaintiff contends that the letter was relevant, and that she, therefore, should have been permitted to lay a foundation for introducing it as past recollection recorded or as a business entry. Her theory at the

trial was that the altimeter of the wrecked plane had been incorrectly hooked up so that when the wheels were lowered it registered an altitude higher than the true one. The pilot and co-pilot of the wrecked plane had testified that it read 500 feet at the time of the crash. The plaintiff also had introduced evidence of the condition of the plane after the accident to the effect that the hose lines, which controlled the air supply to the altimeter, had been switched. The line which the pilot used in making his landing was the one which normally should have been connected with an air supply from the nose, but when switched it introduced air from the housing of the landing gear. Trimble, an expert employed by the defendant—who was its Director of Operations for Europe, testified that on the basis of tests he had conducted with similar planes, a switch in the lines when the wheels were lowered to descend for a landing would introduce an error on the high side of from 125 to 250 feet, depending on the speed and position of the plane. In other words, the switch would make the altimeter read from 125 to 250 feet above the real altitude, thus misleading the pilot of the plane as to its distance above ground.

Captain Sigman's letter stated that in flying a sister ship at a speed of 145 mhp (which was roughly the speed of the plane that suffered the crash at Shannon Airport), he had noted the following, when the co-pilot's altimeter was connected with the alternate source: "The gear was then lowered and immediately his altimeter jumped to 400 above the original reading and also 400 above the altimeter reading on the pilot's side. At this time the selector valve on the pilot's side was moved from static position to alternate source and a 400 foot change was encountered." In other words, Sigman's letter indicated that

2. In the discussions at the Conferences which finally drafted the Warsaw Convention, the English delegate said as to the meaning of the word "dol" appearing in the French original (translated as "wilful misconduct" in the American and English translations, and as "malice" in the Irish translation): "We have in our country the expression 'wilful misconduct.' I believe it covers all that you wish to express; it covers not only acts accomplished with deliberation, but also acts of carelessness without regard of the consequences." [Proces-Verbaux II Conference Internationale de Droit Prive Aerien, 4–12 Octobre 1929, Varsovie, p. 40, 3d session, October 6, morning; published by the Ministry of Foreign Affairs of Poland (1930).]

when the lines were switched and the pilot was introducing air from the wheel well, rather than from the normal or "static" source in the nose, the reading would show 400 feet higher than the true altitude. If the letter had been admitted in evidence it would have tended more strongly than Trimble's testimony to confirm that of the pilot and co-pilot, had the jury believed that the hose line in the altimeter were switched. Accordingly, the letter would not have been objectionable as merely irrelevant, even if it repeated some things already covered by other evidence. Dealing, as it did, with a matter of very considerable importance, we think the plaintiff should have been permitted to show whether it could be admitted and that the court should not have excluded it merely on the ground of irrelevancy. We need not decide whether its exclusion was so prejudicial that it would have called for a reversal if taken alone, but since, as will appear, the case must go back for a new trial, the error is made clear for the benefit of the parties and trial judge.

The most important errors relied on by the plaintiff as a basis for reversing the judgment were the exclusion of certain documents. The documents in question were as follows:

(a) GM4–INT was a letter from Otis F. Bryan, the defendant's Acting General Manager, to "All International Division Personnel Concerned" on the subject of "Emergency Aircraft Procedures," which prescribed the procedure to be followed in the event of an aircraft accident involving TWA International Aircraft. The pertinent sections of this letter dealt with the method of investigating the cause of the accident.

A Regional Accident Board was directed to conduct a complete investigation at the scene, and elsewhere if necessary, "assembling all factual data, determining (the) cause, the extent of damage to the plane, other property and cargo, and the extent of injuries and the fatalities involved. * * * Every attempt is to be made to complete the investigation and report within thirty-six hours after arriving at the scene. * * * Upon completion of the investigation, it shall prepare a report of its findings, conclusions and recommendations in draft form. The report shall be forwarded through Regional Headquarters to the International Division Aircraft Accident Board so as to be received by the latter within 72 hours after the Regional Accident Board convenes." The Chairman of this Board was the Regional Operations Manager; its other members were: the Regional Supervisor of Flying; the Regional Maintenance Supervisor; the Regional Supervisor of Flight Control; two pilots; a meteorologist and a communication supervisor.

Upon advice that an accident had occurred, the General Manager, or one of his assistants, would appoint an International Division Aircraft Accident Board, consisting of an Assistant General Manager or his alternate (Chairman), and Superintendents of Flight Operations, Flight Control, Flying Meteorology, Engineering and Maintenance, Passenger Service, and Stations, plus one person designated by the Assistant General Manager. Upon receipt of the Regional Accident Board Report, the International Board was directed to review the conduct of the investigation, the exhibits, testimony, findings, conclusions and recommendations of the Regional Board. It was also directed to utilize any additional testimony, and to "make a report of its findings and recommendations to the General Manager as soon as the responsibility has been determined." The letter ends with these instructions: if the International Board concurs, "the report shall be written in final form and submitted to the General Manager"; if the International Board disagreed with the Regional Board, then they were to compose their differences and after agreement between them the "final report" was, again, to be submitted to the General Manager.

(b) The Report of the Regional Accident Investigation Board recites that under the provision of GM4–INT the Board convened at Shannon Airport on January 3, 1947. It states that after the accident concurrent investigations were first conducted by the Civil Aviation Branch of the Irish Department of Industry and Commerce,

the Civil Aeronautics Authority and the Civil Aeronautics Board. TWA representatives assisted in these investigations and the TWA Regional Board conducted its own investigations immediately on release of the wreckage to it. The Regional Board's report summarized and discussed the testimony of the tower operator, members of the crash and first aid crews, and members of the ramp personnel groups. The pilot and co-pilot were interviewed, also numerous officials of TWA and the airport. Meteorological reports, weather maps, records of messages sent to and received from the plane while in flight, maintenance records, transcripts of the radio operator's log, the tower log, photographs and sketches of the accident, were among the documentary material relied on. Test flights were made over the airport in a sister plane. The wreck was carefully examined and the condition of its working parts reported. The report contained "findings, one of which recited: 'The accident occurred as a result of the airplane coming in contact with the ground at a time when both pilot and co-pilot believed that they were 500 feet above the ground.' The report continued to say that: 'The Regional Board has carefully considered poor pilot technique as a possible cause of the accident but we believe, from the weight of evidence available, that the accident was caused by errors in the altimeter or altimeters. We have been unable to reach a definite conclusion * * *'" The report ended with a series of recommendations for promotion of safety in air flights and further investigations.

(c) The Maintenance Investigation Board convened on January 21, 1947, in order to ascertain what caused the accident and to present findings and recommendations. Its report recited the details of the course of the airship and determined, from an examination of the pilot's and co-pilot's instrument panels and related parts, from the testimony of the mechanical personnel who had worked on the aircraft, and from maintenance records available, that the lines of the pilot's and co-pilot's altimeters had been reversed between December 16 and 18 by machanic Both while he was reinstalling the panel, that the error was not discovered because a required check was not performed by Both, and that at a subsequent overhauling of the plane on December 24, and 25, the error still was not discovered by mechanic Langsdale who, however, signed the sheets indicating that the check was performed.

(d) The report of the International Division recited that the Board met on June 26, 1947, "for the purpose of reviewing the detailed Accident Investigation Report, which was submitted by the European Region Accident Board, and to analyze all subsequent findings, flight tests, investigations and deposition testimony, which had become pertinent to the accident and necessary to a final determination to (sic) causes and responsibility." The Board consisted of W. L. Trimble, Superintendent of Flight Operations, Chairman; R. M. Dunn, Director of Engineering and Maintenance; W. G. Golien, Manager of Operations, Atlantic Region; R. C. Weaver, Supervisor of Flying, Atlantic Region; A. C. Paterson, Supervisor of Meteorology, and three other officials who attended by invitation as observers.

The Regional Report was read, and the Board then reviewed, as part of the factual information upon which its findings were based, the report of the maintenance investigation, findings as to the altimeter of the wrecked plane, engineering reports of flight tests conducted on sister ships, the Civil Aeronautics Board's hearing and report, and depositions taken by the Civil Aeronautic Board from surviving crew members.

The International Report contained an elaborate summary of the underlying facts, observations of witnesses, statements of pilot and co-pilot, results of test flights, and concluded that "the accident occurred as a result of the error in the altimeter readings in Plane 505, which led the pilot to conduct his approach to the airport at a dangerously low altitude." Most of the altimeter error, the report stated, was due to the reversal of the source lines of the altimeter, and the failure of mechanical personnel to carry out required inspection. The crew was absolved of any negligence.

Detailed recommendations on changes in engineering and inspection techniques followed. The Regional Report was approved by the International Board as "thorough and comprehensive * * * with fitting conclusions and recommendations in light of the evidence available at that time." The International Report also stated that the maintenance investigation "determined exactly at what maintenance operation and by what individuals the incorrect static arrangement was made. Responsibility was definitely established and appropriate action was taken against the individuals concerned. Formal report of the Maintenance Investigation is accepted by this Board and made a part of the reference material of this Report."

It is first argued on behalf of the plaintiff that the reports we have outlined should have been received in evidence as admissions by the defendant. This, in the first place, depended on whether those reports were inconsistent with the position taken by the defendant during the trial. IV Wigmore on Evidence (3rd Ed.) § 1048. The latter had there sought to attribute the accident to the negligence of the pilot of the airplane, contending that such negligence did not amount to "wilful misconduct." The reports, on the other hand, attributed the accident to the switching of the hose lines for the altimeters and in this respect, as well as in their detailed findings, were in accord with plaintiff's theory at the trial.

Admissibility next depended on whether the reports were binding on the defendant. By the General Manager's Bulletin, the plaintiff offered to prove that the defendant through its General Manager set up a system of investigation to determine responsibility for the accident and to provide means for averting future catastrophes. In this connection the General Manager created the International Division Aircraft Accident Board to collaborate with and review the investigations and findings of its Regional Accident Board. The reports and findings of the Regional Board, as well as of the so-called Maintenance Investigation Board, were specifically adopted by the International Board, so that

the question reduces itself to whether the report of the latter is binding on the defendant.

We think it clear from the face of the General Manager's Bulletin, and the Report of the International Board itself, that this Report was intended by the parties to be final and was final. For example, the remedial recommendations by the Maintenance Investigation Board were both adopted and acted upon on behalf of the company. Though the International Report was to be "submitted" to the General Manager, there is no showing that he proposed to act as a reviewing agency. It was to be the final determination of causes and responsibility. No doubt the defendant could act as it saw fit in the light of the report, but this did not affect its finality as a company investigation to determine the truth of what had happened and to aid the company in future operations.

■ Defendant argues that a report by one agent to his principal is never admissible against the principal. It appeared that at least one of these reports was turned over to the Civil Aeronautics Board but, in any event, "if the principal expressly said either before or after the agent spoke that he vouched for the agent's statement or wanted action taken upon it, then it is his statement even though it was not made for communication to the outside world. * * * Even if the principal does not expressly vouch for the agent's statement, if he acts or conducts his business in such a way as to show by implication that he adopted the statement, then such parts of the statement as he acted upon are 'his.' And to that extent the statement is receivable against the principal as an adoptive admission. Morgan, The Law of Evidence, 1941–1945, 59 Harv. L.Rev. 481, 599 before note 322; Morgan, Admissions, 12 Wash.L.Rev. 181, 186." Quoted from the interesting opinion of Wyzanski, J., in United States v. United Shoe Machinery Corp., D.C., 89 F.Supp. 349, 352.

While the defendant here was a corporation, it did not necessarily have to act through its board of directors or stockholders to authorize a final report for

whose truth it vouched or upon which it wanted action taken. It would seem idle to question the authority of the general manager to inaugurate the investigation and to set up suitable boards of experts to arrive at what the company considered the truth, especially when the reports took nearly six months of the time of company employees, were the basis for at least some company action, and were to some extent at least filed with the Civil Aeronautics Board. In the light of the circumstances it would have been only fair to require defendant to explain the inconsistencies between these reports and its own position at the trial, despite the lack of an opportunity for testing the declarants by cross-examination and oath.

The defendant makes the further claim that the reports were properly excluded because they contained double hearsay, that is, the board members based conclusions upon matters not within their own personal knowledge. This was no valid objection to an admission. IV Wigmore on Evidence (3rd ed.) § 1053(1). The reports did not merely repeat what was told the board by witnesses, but drew inferences as to what had in fact happened and those inferences were contrary to the position taken by the defendant during the trial. Reed v. McCord, 160 N.Y. 330, 54 N.E. 737.

■ Finally, the defendant insists that much of the reports were nothing but opinions of the various boards. Inconsistent opinions as well as inconsistent statements of underlying facts may qualify as admissions, for: "The *Opinion Rule* does not limit the use of a party's admissions." IV Wigmore (3rd ed.) § 1053(3). This is especially true where the opinions were the result of the deliberations of boards skilled in dealing with the subject matters before them. We think that the reports were all admissible *in toto*. Indeed, it would seem to be impossible to disentangle the conclusions from the facts on which they were based. Moreover, out of fairness to both parties the jury should have been able to consider all the reports as a whole. The fact that they were based on hearsay and expressed opinions would go to their credibility rather than to their admissibility.

■ The plaintiff finally argues that the reports were admissible under the Federal business entry statute, 28 U.S.C.A. § 1732, which is set forth in the margin.[3] Defendant replies that the decision of the Supreme Court in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, precluded the admission of the reports. In the course of the opinion by Mr. Justice Douglas in that case it was said:

"An accident report may affect [the] business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. * * * In short, it is manifest that in this case those reports are not for the systematic conduct of the enterprise as a railroad business. Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading." 318 U.S. 113, 114, 63 S.Ct. 480.

The reports in the case at bar were "regular" within the meaning of the stat-

3. "§ 1732. *Record made in regular course of business*

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind." June 25, 1948, c. 646, 62 Stat. 945.

ute, because they were required not merely in investigating the accident at the Shannon Airport but all future accidents. However, the opinion of the Supreme Court added that regularity of preparation would not in itself be enough to justify the use of the evidence. We think the court evidently was aiming at the evils of introducing evidence built up to promote the self-interest of the entrant. Thus, the opinion stated that the purpose of the act was to "facilitate admission of records which experience has shown to be quite trustworthy." 318 U.S. 113, 63 S.Ct. 480. Accordingly, "the character of the records and their earmarks of reliability * * * acquired from their source and origin and the nature of their compilation" was said to be the test for their qualification under the statute. 318 U.S. 114, 63 S.Ct. 480. The Circuit Court of Appeals had excluded the evidence on the ground that, as stated by the majority of that court, it was "dripping with motivations to misrepresent", Hoffman v. Palmer, 2 Cir., 129 F.2d 976, 991. It was this consideration, we believe, that led the Supreme Court to say that the reports in Palmer v. Hoffman, supra, were not business entries within the meaning of the statute for the reason that: "Their primary utility is in litigating, not in railroading."

The reports in the case at bar were against the interest of the entrant when made, since they charged serious fault on the part of employees Both and Langsdale, and whether or not completely accurate were clearly not part of a story cooked up in advance of litigation in the disguise of business records. Moreover, it is not the entrant who here sought to introduce the reports, but the plaintiff, and this too tends to show that they were not contrived by the entrant for litigation. Palmer v. Hoffman was given the above interpretation by this court in United States v. Moran, 151 F.2d 661, 662, 167 A.L.R. 403, and Lopoczyk v. Chester A. Poling, Inc., 152 F.2d 457, 460, note 4. We hold that Palmer v. Hoffman did not preclude the reception under the business entry statute of the reports offered in the case at bar.

It might be argued on behalf of the defendant that the reports did not constitute a "record of any act, transaction, occurrence, or event" within the meaning of the statute because they contained opinions. Opinions of physicians and a coroner regarding matters within their expert competency have been held admissible as business entries by this court. Hunter v. Derby Foods, Inc., 110 F.2d 970 (coroner's death certificate); Reed v. Order of United Commercial Travelers of America, 123 F.2d 252 (hospital record); Buckminster's Estate v. Commissioner of Internal Revenue, 147 F.2d 331 (hospital record). We hold that inferences drawn by boards such as those set up in the present case were of the same general character, and were admissible.

It may further be argued that the conclusions in the reports were in part derived not from the personal observation of the entrant, but from information supplied by persons under no business duty to report, and that they were, therefore, not "made in regular course of any business" within the meaning of the statute. In Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467, 473, the Court of Appeals for the Third Circuit, per Goodrich, J., in dealing with an accident investigation by the Bureau of Mines of the United States Department of the Interior, held as follows: "The report is no less admissible because it contains conclusions of experts which are based upon hearsay evidence as well as upon observation. These circumstances, by virtue of express statutory provision, go to weight rather than to admissibility. [28 U.S.C.A. § 1732 in part: 'All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.'] Moreover, this Court has several times held that hospital records are admissible under the statute, and certainly medical diagnosis is no less a matter of opinion based upon observation and perhaps hearsay than this report of the Bureau's investigation."

We agree with this interpretation of the Federal business entries act by Judge Goodrich, see V Wigmore on Evidence (3rd ed.) § 1530a. Nor would the decision of the New York Court of Appeals in Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517, if we were to adopt its reasoning here, as we perhaps did in United States v. Grayson, 2 Cir., 166 F.2d 863, 869,[4] call for a different result. In the case at bar most, if not all, of the sources of information were from persons who were under a duty to report to these boards as part of their employment; we include among such persons not only the employees of TWA, but also the employees of the airport and of the Irish Government. If there were any other sources of information, we do not think it would make any difference where expert boards, which appear to have been disinterested, were set up as a matter of business routine to weigh information from all sources and to draw inferences therefrom.

For the foregoing reasons the judgment is reversed, and a new trial ordered.

4. But cf. Tucker v. Loew's Theatre & Realty Corp., 2 Cir., 149 F.2d 677, 680.