**R. P. FARNSWORTH & CO., Inc.,**
**Plaintiff,**

v.

**The CONTINENTAL MARBLE CO., Inc.**
**and Great American Insurance Co.,**
**Defendants.**

**No. Civ. 359–66.**

United States District Court
D. Puerto Rico.

Nov. 1, 1967.

Reinaldo Paniagua Diez, Gonzalo Diago Betancourt, San Juan, P. R., for plaintiff.

Rieckehoff, Calderon, Vargas & Arroyo, San Juan, P. R., for defendants.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

CANCIO, Chief Judge.

This cause came to be tried before this court, sitting without a Jury, the trial starting on July 31, 1967, and ending on

August 14, 1967. Sidney S. Allen, Esq. of the New York Bar, admitted by courtesy for the purposes of this case, represented plaintiff; Iván Díaz de Aldrey, Esq., a member of the Bar of this Court, represented defendant The Continental Marble Co., Inc.; and Alvaro R. Calderón, Jr., Esq., also a member of the Bar of this Court, represented defendant Great American Insurance Co.

Various stipulations were entered into by the parties and submitted to the Court, which approved them, covering amendments of pleadings, waiver of causes of action, admission of evidence, etc., the most important of which, for the purposes of these Findings and Conclusions, are the following:

1.– Plaintiff waived and withdrew that part of its claim related to general and special damages for alleged loss to its business reputation and profits.

2.– Defendant The Continental Marble Co., Inc. (hereinafter referred to as Continental Marble) waived and withdrew that part of its counter-claim included under paragraph 3 of the same, except interest for failure to make payment on time.

3.– Defendant Continental Marble limited that part of its counter-claim covered under paragraph 1 of the same to the—$25,646.20 admitted by plaintiff, plus the $486.80 of its charge for extra thickness in the exposed aggregate.

4.– The active participation by the attorney for Great American Insurance Co. in all the aspects of the trial was without prejudice to the right of said Great American Insurance Co. to contend, as it contends, that the bond issued by it does not cover the work performed under Change Order No. 6 and any claims arising thereunder.

5.– The Court could reserve its rulings on the admissibility of certain documentary evidence until such time as all the witnesses for the proponent finished testifying, memoranda on the question of law of the admissibility of said evidence was submitted, and the Court was ready to hand down Judgment, it being further stipulated that if any ruling on the admissibility of such documentary evidence was contrary to the offering party, such party expressly waived its right to present other evidence in lieu thereof.

Memoranda have been filed and the Court, upon consideration of all the pleadings, the evidence, the said Stipulations and the said Memoranda, being fully appraised in the premises, makes its

## FINDINGS OF FACT

1.– Plaintiff is a corporation organized under the laws of Delaware with principal place of business in New York.

2.– Defendant Continental Marble is a corporation organized under the laws of Puerto Rico and has its principal office in Puerto Rico.

3.– Defendant Great American Insurance Co. is a corporation organized under the laws of New York with principal place of business in New York.

4.– The amount in controversy exceeds the sum of $3,000.00.

5.– Plaintiff and defendant Continental Marble entered into a contract, dated August 28, 1962, whereby plaintiff, as main or prime contractor of the Puerto Rico Sheraton Hotel in San Juan, Puerto Rico, sub-contracted with Continental Marble the terrazzo and marble portions of the work covered under the plans and specifications of the main construction contract, all of which were made a part of said sub-contract by reference.

6.– Defendant Great American Insurance Co. executed a Performance and Payment Bond, dated February 27, 1963, (which had been printed by plaintiff as part of said sub-contract) binding the obligees therein, defendants herein, as to the performance of said sub-contract and all duly authorized modifications to the said sub-contract that were thereafter made, notice of which modifications to the surety was waived by the latter, defendant Great American Insurance Co.

7.– Said sub-contract provided, among other things, that the "sub-con-

tractor shall pay contractor the sum of $3,000 as liquidated damages and not as a penalty for each and every day that sub-contractor delays the job."

8.– Ten Change-Orders, numbered 1 to 10 were issued by plaintiff and accepted by defendant Continental Marble. Nine of these Change Orders (all except No. 6) modified the sub-contract. Change Order No. 6 added to the sub-contract, which had covered the marble and terrazzo work at the hotel, the construction of the exposed aggregate areas around the pool, cabañas, and certain other walks and outside areas near the main hotel structure.

9.– The Puerto Rico Sheraton Hotel was inaugurated and opened for business during the first days of October, 1963.

10.– The hotel had not been formally accepted by the owner by that time, however, and certain work of completion and correction still had to be performed by plaintiff, including work not covered by the sub-contract with defendant Continental Marble.

11.– By the end of May 1964, all the corrective and completion work had been performed by plaintiff or its sub-contractors, except that a certain problem had arisen with respect to the exposed aggregate, to which reference is made hereinafter in these findings.

12.– Excluding the problem of the exposed aggregate, defendant Continental Marble was not involved in any delay which might have occurred in the final acceptance of the project after May 1964. The only other items pending at this date were so minor and inconsequential that Mr. Pablo Lugo, engineer in charge for Passalacqua & Cía., the owner's project manager, who appeared as a witness for plaintiff, testified that he would have recommended acceptance of the hotel at this time if it had not been for the problem of the exposed aggregate.

13.– Plaintiff became involved in a controversy with the owner (for reasons not pertinent hereto), the hotel was never formally accepted, a suit was filed in this court by plaintiff against the owner and the case (Civil No. 390–64) was finally settled out of court.

14.– By reason of the said controversy, and its out-of-court settlement, there is no final acceptance date for this contract.

15.– The stones in some of the exposed aggregate surfaces of the Puerto Rico Sheraton Hotel started to come loose shortly after the hotel was inaugurated early in October of 1963.

16.– The court finds that this deterioration of the exposed aggregate surfaces was the direct and foreseeable result of the manner in which these areas were cleaned with hydrochloric acid by plaintiff to remove cement and other materials which other trades had spilled. Although the court need not, and does not, conclude that cleaning of exposed aggregate with hydrochloric acid is per se improper, it finds, from the testimony of the expert witnesses for both sides (whose testimony is not fundamentally contradictory) and from all the other evidence submitted, that extreme care must be exercised whenever an acid solution of hydrochloric acid is brought into contact with concrete or exposed aggregate surfaces, and that this must be done under carefully controlled conditions if no damage is to be suffered by such surfaces. From the testimony of witnesses who have been found trustworthy by the court, it finds that the manner in which this cleaning with acid solution was done by plaintiff was careless and haphazard and the necessary control and constant supervision were not present. As a result, the exposed aggregate surfaces, which Continental Marble had finished in a proper and acceptable manner, were irreparably damaged.

17.– On January 7, 1965 plaintiff sent defendant Continental Marble (with copy to defendant Great American Insurance Co.) a final statement of its liquidation of the sub-contract. This document is in evidence as plaintiff's Exhibit 42. Plaintiff admits owing defendant Continental Marble $25,646.20 but claims it is entitled to back-charge said defendant in the sum of $40,995.87, of which $27,-

661.04 are for replacement of the exposed aggregate and $13,334.83 for other reasons.

18.– Of the other back-charges totalling $13,334.83, the following, as they appear from Schedule "C" of said Exhibit 42, merit comment from the court, and specific findings will be made covering them:

|     |                    |             |
| --- | ------------------ | ----------- |
| a.) | Casino clogging    | $ 3,716.87  |
| b.) | Touch-up paint     | $ 960.15    |
| c.) | ½" less exp. aggr. | $ 2,281.45  |
| d.) | Tower floors       | $ 3,505.64  |
| e.) | Marble in lobby floor | $ 810.00 |

19.– With respect to the so-called "Casino clogging" this item is the result of damage suffered by the ceilings of the Casino and the lobby when some pipes which run above these ceilings became clogged, plus the cost of the unplugging of these pipes. The pipes did not burst, leak or overflow and the evidence shows that the damage was suffered by the casino and lobby ceilings when the clean-outs immediately above the ceilings were unplugged in such a manner that the ceilings became wet and damaged. The ceiling was further heavily damaged by the workers clearing the lines. Whether this damage was due to carelessness on the part of the workers of the plumbing sub-contractor or due to faulty design in placing the clean-outs in a nearly inaccessible space between the floors above and the said ceilings is immaterial for the purposes of this action: in neither case is defendant Continental Marble responsible for damages resulting from the manner in which the clogged pipe lines were cleared, particularly as it has not shown to the satisfaction of the court that defendant Continental Marble was directly and solely responsible for such clogging. Plaintiff's own documentary evidence shows that when the lines were cleared, *rocks* were found inside. And the evidence is uncontested that, assuming that some slurry may have been poured by workers of defendant Continental Marble into these pipes instead of into the costly temporary waste disposal system built by defendant Continental Marble for this purpose, slurry never becomes hard enough, even when completely dry, that it could be called "rocks". The court concludes that plaintiff has no right to back-charge defendant Continental Marble for this item.

20.– The amount of $960.15 which plaintiff is back-charging to defendant Continental Marble is not the actual cost of painting surfaces which said defendant's workmen may have soiled or damaged but is an estimated guess made by a painting sub-contractor and informed to plaintiff, of what it thought Continental Marble should bear of the total cost of touch-up painting charged to plaintiff by this painting sub-contractor. No evidence was produced that the workmen of defendant Continental Marble were responsible for such soiling as may have cost plaintiff $960.15 to repair. The Court can make no finding against said defendant on the basis of an unsupported estimate by a painting sub-contractor which did not appear in court, nor is the evidence that other sub-contractors accepted deductions on such an estimated percentage basis binding on defendant herein.

21.– Likewise, there is no factual basis, which has been found creditable by the court, for the back-charge of $2,281.45 which plaintiff claims against defendant Continental Marble because Continental Marble had to pour exposed aggregate in less thickness than contemplated. Plaintiff's own project supervisor testified that no such back-charge would have been issued if defendant Continental Marble had not made a claim for extra thickness of the exposed aggregate. The court concludes that this back-charge was an after-thought after the claim for extra-thickness was made, and, like Findings of Facts No. 20, supra, it is unsupported by evidence, believable by the court, that defendant Continental Marble laid the exposed aggregate in a thickness of ½ inch less than that called for in the sub-contract. On the contrary, the Court believes the testimony of the President of defendant Continental Marble, Mr. Raúl Buxeda, that in some places, because the bottom concrete slabs on

which the exposed aggregate was to be placed were not level and the surface of the exposed aggregate had always to be level, that Continental Marble had to pour exposed aggregate in extra thickness, and therefore that it has a valid charge against plaintiff for this reason in the amount of $486.80.

22.– When the performance of the terrazzo part of the sub-contract was coming to an end, a controversy arose between plaintiff and defendant Continental Marble as to the final washing and buffing of some floors in the tower. Plaintiff insisted that Continental Marble proceed forthwith with this work. Continental Marble took the position that the floors had been dirtied by other trades, particularly by painters, and that the floors had to be cleaned of this paint before they could proceed. After trying to clean and buff some floors in this condition, defendant Continental Marble advised plaintiff that it could not continue to do so until the paint was removed. Plaintiff insisted that defendant Continental Marble perform this work with the floors in the conditions they were and upon Continental Marble's failure to do so, contracted this work with another sub-contractor, which billed plaintiff $3,505.64. Plaintiff seeks to back-charge defendant Continental Marble for this amount. The court finds that Continental Marble did not have to perform this work with the floors in the condition they were after staining by the painters and did not have to remove such paint. Plaintiff's own witness, Mr. Simmonds, admitted that he, on behalf of plaintiff, later back-charged the painting sub-contractor for the cost of removing the paint from these floors. This is an admission by plaintiff that the floors were so stained and that it was the painting sub-contractor's fault and responsibility that the floors were sustained, and plaintiff could not require Continental Marble to do this job when another trade had stained the floors. There is no record that *after* this paint was removed, defendant Continental Marble was required, requested or given the opportunity to finish this particular job. Furthermore, the bill of this sub-contractor is unsupported by oral testimony and comes within the documents excluded under the ruling we make in Conclusion of Law No.

23.– Plaintiff is also back-charging Continental Marble for $810.00 as the supposed cost of replacing three marble slabs in the lobby floor. How plaintiff arrived at this figure is unexplained, except that it appears to be an estimate of the owner's project manager. No expert witness testified as to the cost of changing these slabs, and the figure stands unsupported by oral evidence. This hotel has been in operation for over four years and the owner has not replaced these slabs. During the examination of the premises made by the court on August 3, 1967 together with the counsel for the parties, these slabs were not noticed, and they were not brought to the attention of the court by plaintiff's counsel. No evidence has been presented that this amount was taken into consideration and deducted from owner's payment to plaintiff when the settlement covering the payment due by the owner to plaintiff was entered into. In the absence of such evidence, allowing plaintiff to claim this amount from defendants herein would amount to enriching itself in said amount for something which it has not done and for which there is no evidence that it is still legally bound to the owner to do.

24.– The original contract for the construction of the Puerto Rico Sheraton Hotel provided that Imperial Danby marble from the Vermont Marble Co. be used as floor marble, front-office counter top and on certain stair treads and risers. Subsequently, as one of the architects of the building stated when he appeared as a witness for plaintiff, because Imperial Danby was not available from the Vermont Marble Co. due to the simultaneous construction at that time of the National Geographic Building in Washington, D. C., defendant Continental Marble submitted a sample of an Italian marble known as Paonazetto which was approved by the owner. Although the specifications required that 3 samples be submitted, approval was given to this

type of marble on the basis of only one sample. This sample contained a label on the back with the printed warning, usual in the trade, to the effect that marble is a product of nature and therefore differences in color and veigning are to be expected between samples and the marble as delivered. Defendant Continental Marble obtained the Paonazetto marble in Italy, but after it had been taken to the job-site, it was rejected by the owner because it was not, in the owner's opinion, similar to the sample submitted. Plaintiff informed defendant Continental Marble of this rejection, ordered it to remove this marble from the job-site and to obtain other marble. Although Paonazetto was later allowed to be used under the sub-contract as the proper marble for the stairs, the sills of the Casino and the front-desk counter top, Continental Marble's President had to make a special emergency plane trip to Italy to try to obtain some other marble immediately for use in the lobby floor. He obtained Carrara statuary marble for this purpose, and it was approved and installed. The court finds that the owner and plaintiff were not justified in rejecting the Paonazetto marble which had been purchased by defendant as not conforming to the sample, and requiring defendant to buy Carrara marble for the floor. Although plaintiff's case rests on the dissimilarity with the sample (there is no doubt that the marble supplied was Paonazetto) plaintiff did not produce the sample in court. The architect, testifying as plaintiff's witness, stated that Paonazetto was accepted because it was the available marble which looked most like Imperial Danby and that the sample submitted showed it was essentially a white marble with a very light veigning of gray, while the marble that was delivered had brownish or yellowish streaks or stains, which, as he clarified later, should truthfully be called veigning. This marble, he stated, was not what he visualized had been approved. The court notes, however, that the Imperial Danby called for in the original contract specifications was to have "brown and tan veigning" *predominating* and traces of gray and green veigning. Taking into consideration the oral and documentary evidence adduced on this point, as well as the visual examination made by the court on the occasion of its visit to the premises, the court concludes that no adequate justification existed for refusing to accept the Paonazetto as delivered after it had been approved, that such a refusal constituted a breach of the contract between plaintiff and defendant Continental Marble, and that this breach of contract caused direct damages to Continental Marble in the amount of $10,-921.72, of which $9,957.67 is for the cost of the new marble it had to purchase to replace the Paonazetto and $964.05 for the expenses of the trip to Italy of Mr. Buxeda.

## CONCLUSIONS OF LAW

1.– Plaintiff may not charge defendant Continental Marble for the cost of replacing the exposed aggregate.

2.– Plaintiff may not charge said defendant for the items covered by Findings of Facts 18 to 23, both inclusive.

3.– Plaintiff owes defendant Continental Marble under their contract the amount of $23,568.48.

4.– Plaintiff owes defendant $10,921.72 for its breach of contract in refusing to accept the Paonazetto marble previously approved.

5.– Defendant Continental Marble is entitled to receive interest at the legal rate provided by Puerto Rico law (6%) in the monies owing to it by plaintiff under the contract from the moment that they became due and payable. Since May 1964 is given as the date by which all corrections had been made, and the only real problem left by that time was the question of the exposed aggregate, the Court concludes that plaintiff must pay defendant Continental Marble interest at said rate from June 1, 1964 to date of payment. This, however, is not applicable to the amount granted as damages for breach of con-

tract in connection with the matter of the Paonazetto marble, which amount of damages was unliquidated and therefore does not start to bear interest until judgment.

6.– Plaintiff's complaint shall be dismissed as to both defendants and the counter-claim of defendant Continental Marble shall be granted in the amount of $34,490.20 of which $23,568.48 shall bear interest at 6% per annum from June 1, 1964 until date of payment.

7.– Plaintiff shall bear the costs of this action.

8.– In view of the Findings of Facts made by the Court, it is unnecessary that the Court pass on the question of law raised by defendant Great American Insurance Co. that the performance and payment bond issued does not cover the exposed aggregate work performed by virtue of Change Order No. 6.

9.– Likewise, in view of the Findings of Facts made by the court, it is unnecessary that the court decide whether plaintiff would have been entitled to claim both for actual damages and for liquidated damages, or that in claiming the former it had waived the latter.

■ 10.– With regard to the admissibility in evidence of certain documents, mostly bills submitted to plaintiff by independent contractors, which were sought to be admitted under the "shop-book rule" for the purpose of binding defendants to the payments of said amounts, and concerning which no witnesses from said sub-contractors testified, the Court rules that they were not admissible in evidence. Plaintiff contends that they are admissible under 28 U.S.C. § 1732(a). We rule that they are not because the bills were not prepared in the regular course of business of plaintiff, whose witness was on the stand identifying the documents from its files, but were prepared in the regular course of business of an independent contractor (sub-contractor) who sent them to plaintiff. No officer or custodian of records for any such sub-contract-

ors was present to identify the documents.

The leading case in the interpretation of the "Federal Shop-Book Statute", as Sect. 1732 of Title 28 U.S.C. is sometimes known, is undoubtedly Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719. This decision tended to restrict the statute.

"The federal shop-book rule statute does not, however, render admissible all things made a matter of record in the books of a business. A restrictive reading was given to the statute in *Palmer v. Hoffman.*"

Barron & Holtzoff, Federal Practice & Procedure, Wright Edition, Section 971, Vol. 2B, Pages 254–255.

Decisions in the different Circuits differ as to how to construe the section in the light of *Palmer v. Hoffman*. The Second Circuit has read the statute broadly and *Palmer v. Hoffman* narrowly. (Pekelis v. Transcontinental & Western Air, Inc., 2 Cir., 187 F.2d 122, 130). The Ninth Circuit has required that there exist a systematic or routine procedure in the preparation and filing of such documents. (Standard Oil of California v. Moore, 9 Cir., 251 F.2d 188, 215). And still another view, to which the Fourth Circuit has adhered, is that the admissibility is determined by the character of the records and their earmarks of reliability acquired from their source and origin and the nature of their compilation.—(Hartzog v. United States, 4 Cir., 217 F.2d 706. Cf. Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725, of the District of Columbia Court of Appeals.) A relevant factor is not only what sort of record is involved but who made the entries. And the records sought to be admitted here were made, not by plaintiff, but by a sub-contractor. A case in point is United States v. Martin, D.C., 167 F.Supp. 301, in which the court, in rejecting certain records sought to be introduced in evidence, said that although they had been found in the creditor companies' books, they had not been made by them but by Dun & Brad-

street, a credit-rating agency, "[were] not prepared or made under the supervision or control of any employee or officer of creditor companies and therefore are not records whose trustworthiness can be established by testimony of any person who systematically kept or supervised the records of creditor companies," could not be held to be admissions of truth of statements contained therein and were not "business records" within the shop-book rule. (Cf. Masterson v. Pennsylvania Railroad Co., 3 Cir., 182 F.2d 793).

In Savannah Bank & Trust Co. v. Great American Indemnity Co., 1 Cir., 303 F.2d 247, *250*, the Court of Appeals for the First Circuit, in an appeal from a Judgment of this Court, held that this Court erred in admitting into evidence under the "Shop-Book Rule" a bill of sale which plaintiff-appellee had in its records and which had been filed there in the regular course of its banking business. The Court of Appeals held that it was inadmissible because the writing was not made by *the plaintiff-appellee* in the regular course of its business. The same situation exists in this case.

In Williams v. National Surety Corp., 5 Cir., 257 F.2d 771, cited by plaintiff in support of the admissibility of these bills, the vouchers, payrolls and other data were those *of the contractor itself,* not of independent contractors. The Court has admitted in evidence in this case all of plaintiff's records as to the actual expenditures it had in trying to correct what it claimed was defendant's defective work, such as the expenses it incurred in replacing the exposed aggregate. Mr. Simmonds testified as to the trustworthiness of such records. The Court also admitted in evidence the bills of such sub-contractors who appeared to testify concerning their records. But the Court will not accept the bills for expenses incurred by other sub-contractors in those cases in which the officers or custodians of such records for the sub-contractors did not appear in Court.

11.– Judgment shall be entered according to these Conclusions of Law.