251 F.2d 188
 STANDARD OIL COMPANY OF CALIFORNIA, a corporation, Shell Oil
Company, a corporation, The Texas Company, a corporation,
Richfield Oil Corporation, a corporation, General Petroleum
Corporation, a corporation, Tide Water Associated Oil
Company, a corporation, and Union Oil Company of California,
a corporation, Appellants,
v.
George F. MOORE, Appellee.
 No. 14927.
 United States Court of Appeals Ninth Circuit.
 Nov. 6, 1957, Rehearing Denied Feb. 10, 1958.
 
 Marshall P. Madison, Francis R. Kirkham, William E. Mussman, Pillsbury, Madison & Sutro, San Francisco, Cal., Helsell, Paul, Fetterman, Todd & Hokanson, Seattle, Wash., for appellant, Standard Oil Co. of California.
 George W. Jansen, New York City, Arthur Tucker, James O. Sullivan, Los Angeles, Cal., and Milton Handler, New York, N.Y., Grosscup, Ambler, Stephan & Miller, Seattle, Wash., of counsel, for appellant, The Texas Co.
 William J. DeMartini, Los Angeles, Cal., for appellant, Richfield Oil Corp., Graham, Green & Dunn, Seattle, Wash., of counse.
 Robert W. Graham, Seattle, Wash., Howard Painter, Paul E. Bermingham, Los Angeles, Cal., for appellant General Petroleum Corp., Bogle, Bogle & Gates, Seattle, Wash., of counsel.
 DeWitt Williams, Seattle, Wash., William F. Kiessig, Edmund D. Buckley, San Francisco, Cal., for appellant Tide Water Associated Oil Co., Eggerman, Rosling & Williams, Seattle, Wash., of counsel.
 L. A. Gibbons, Los Angeles, Cal., Moses Lasky, San Francisco, Cal., Herbert S. Little, Seattle, Wash., for appellant Union Oil Co. of California, Brobeck, Phleger & Harrison, San Francisco, Cal., Little, LeSourd, Palmer, Scott & Slemmons, Seattle, Wash., of counsel.
 Newman H. Clark, Seattle, Wash., S. R. Vandivort, San Francisco, Cal., for appellant Shell Oil Co., Venables, Ballinger & Clark, of counsel.
 Ferguson & Burdell, William H. Ferguson, Charles S. Burdell, William Wesselhoeft, Donald McL. Davidson, Phil H. DeTurk, Seattle, Wash., for appellee.
 Before STEPHENS, Chief Judge, and POPE and HAMLEY, Circuit Judges.
 HAMLEY, Circuit Judge.
 
 
 1
 This is a treble-damage antitrust suit, brought by George F. Moore, a former Seattle gasoline service station owner and operator, against seven major oil companies.[1] Charging defendants with the destruction of his business, plaintiff sought treble damages in the amount of $285,000. He also asked for a decree requiring defendants to divest themselves of all interest in, or control of, retail service stations in the competitive area. Attorneys' fees in the sum of $40,000 were requested.
 
 
 2
 After a trial which lasted more than three months, the jury returned a verdict of $80,000 trebled, or a total of $240,000. Judgment in this sum, and for attorneys' fees in the amount of $40,000, was entered on June 24, 1955. The prayer for equitable relief was denied.
 
 
 3
 Defendants appeal. Under five general specifications of error, they question the sufficiency of the evidence to support the verdict, the manner in which the coconspirator rule was applied, the admissibility of some of the evidence, the failure to give certain instructions, the giving of other instructions, and the failure to set aside the verdict because of asserted extraneous influences upon the jury.
 
 I.
 
 4
 Background of the Case.
 
 
 5
 Each of the appellants is engaged in the business of producing and refining oil, and in transporting and marketing gasoline, oil, and other petroleum products, in Washington and other states. The production and (at the times here in question) refining operations take place in California. Transportation to the state of Washington is generally by ship tanker. The gasoline is received by appellants at their respective marine storage terminals, and from there it is distributed to bulk storage plants located at convenient marketing centers.
 
 
 6
 Distribution from these terminals and plants falls generally into four categories: Sales to independent service station dealers; retail sales at company-operated stations; sales to secondary wholesale distributors or jobbers; and sales to large commercial, agricultural, and industrial consumers. Except for appellants, only one company transports gasoline into the Puget Sound area of Washington, and then only in relatively small amounts. During the period in question, there was no well production of petroleum products in the state of Washington.
 
 
 7
 In 1939, Moore opened a retail gasoline service station and truck service station at 1961 Fourth Avenue South, in Seattle. Except for eight months in 1944, when he served in the army, Moore operated this station continuously until August, 1952. Throughout this period, Moore obtained his gasoline and other petroleum products from Tide Water.
 
 
 8
 Moore was an extremely competitive dealer. While Tide Water required him to post retail gasoline prices on his pumps, it was his practice to give discounts which resulted in a net gasoline price lower than the posted price. Generally speaking, this discount, which he gave to all customers, was three cents a gallon.
 
 
 9
 Moore's business was successful from the beginning. This was due to his pricing policy, the excellence of his location, the efficiency of his operation, his ability as a salesman, and perhaps other factors. His business grew steadily, year by year, until he became the largest Tide Water dealer in the state of Washington. Eight employees were required to operate the station. By 1951, his annual gasoline sales exceeded 1,600,000 gallons.
 
 
 10
 Commencing in 1950, however, disagreements developed between Moore and Tide Water. The nature of these disagreements will be discussed at a later point in this opinion. Late in 1951, Moore began looking around for another source of supply. He had conversations with representatives of Standard and General. At that time, however, both of these appellants declined to deal with Moore. Negotiations between Moore and representatives of Union, begun in October or November, 1951, were still in progress in May, 1952.
 
 
 11
 On May 2, 1952, Moore received a written notice from Tide Water, canceling its contract with him, effective July 30, 1952.[2] He continued his negotiations with representatives of Union during the period from May 2 to July 30, 1952. In June or July, 1952, Moore also had several conversations with representatives of Richfield. Before the end of July, however, Richfield indicated its refusal to deal with Moore on the basis which he proposed.
 
 
 12
 Tide Water supplied no gasoline or oil to Moore after July 30, 1952. By utilizing the large capacity of his storage tanks and obtaining relatively small quantities of gasoline from independent sources, Moore was able to operate his service station for a few days after that date. During this period, negotiations continued with Union, and were reopened with General. Moore also made a 'last-minute' effort to obtain gasoline from each of the other appellants.
 
 
 13
 As events turned out, Moore did not obtain a continuing supply of gasoline and diesel oil from Union, General, or any other source, following termination of the Tide Water supply on July 30, 1952. When Moore's stored supply became exhausted about the middle of August, 1952, he closed his service station. The complaint in this action was filed on October 4, 1952.
 
 
 14
 The theory of the action is that Moore was refused a supply of gasoline pursuant to, and in furtherance of, an agreement, combination, or conspiracy in restraint of, or to monopolize, interstate trade and commerce, entered into by two or more of the appellants.[3] Jurisdiction to entertain the action and grant the requested relief is asserted under several sections of the Sherman, Clayton, and Robinson-Patman Acts (15 U.S.C.A. 1, 2, 13, 13a, 14, 15, 18, and 26).
 
 
 15
 In Moore's first amended complaint, the alleged unlawful agreement, conbination, or conspiracy is pictured as one to accomplish a dual purpose through multiple lines of action. It is asserted that the general objectives were to control, fix, and regulate gasoline prices, and to monopolize, control, and channelize the distribution of gasoline.[4] The plans and programs adopted in furtherance of these objectives, Moore alleges, relate both to the refining and to the distribution of gasoline.
 
 
 16
 Concerning the refining of gasoline, these plans and programs, according to the complaint, called for self-imposed controls and restrictions upon appellants' own activities.[5] With respect to the distribution of gasoline, it is alleged that these plans and programs included not only self-imposed controls and restrictions, but also the imposition of various forms of economic pressure and coercion upon wholesale distributors and retail dealers.[6]
 
 
 17
 As compared to the sweep of these allegations, the averments concerning the way in which the asserted unlawful agreement, combination, or monopoly injured Moore raise a relatively narrow issue. It is not alleged that during the time he was engaged in business Moore's profits or costs were affected in any manner by reason of the production, refining, transportation, storage, marketing, or pricing policies referred to above. The way in which Moore was damaged, according to the complaint, was in being driven out of business at a time when the business was prospering. This was accomplished, it is alleged, by the practice of one of the forms of economic pressure contemplated by the asserted unlawful agreement, combination, or conspiracy-- namely, concerted refusal to deal.[7]
 
 
 18
 Appellants filed separate answers in which they denied the allegations of the complaint concerning the alleged agreement, combination, or conspiracy, concerted refusal to deal, and monetary loss. The cause came to trial on the issues raised by these pleadings. As before noted, the jury verdict was for Moore, and the judgment conforms to the verdict.
 
 II.
 
 19
 Sufficiency of the Evidence-- In General.
 
 
 20
 Before reaching any question as to the amount of damages sustained by Moore, the jury had to find in his favor on two other questions of fact. One of these is whether Moore was unable to obtain a supply of petroleum products which would permit him to remain in business.[8] The other is whether the liability to obtain such a supply, if this was the The other is whether the inability to or conspiracy of the kind alleged.
 
 
 21
 The verdict represents a jury finding for Moore on both of these questions. Appellants' first specification of error challenges the legal sufficiency of the evidence to support either of these findings.
 
 
 22
 The evidence is legally sufficient to support a jury finding on any question of fact, if it is of such substance and character that reasonable men might reach that conclusion. In determining whether the evidence meets this test, all reasonable inferences therefrom, favorable to the verdict, are to be drawn. Likewise, all conflicts between evidence submitted by the prevailing party and the evidence submitted by the losing parties are to be resolved in favor of the verdict. Where testimony submitted by the losing party, although not directly contradicted, is inconsistent with the verdict, it is to be assumed that the jury disbelieved such testimony, as it had the right to do.
 
 
 23
 In determining the sufficiency of the evidence to support the verdict, there is authority for appellate court disregard of the evidence held to have been improperly admitted. See Oras v. United States, 9 Cir., 67 F.2d 463, 465. Here, however, the asserted inadmissibility of evidence is based upon claimed lack of foundation testimony-- which might be supplied on a new trial. It will therefore be assumed, in discussing the sufficiency of the evidence, that all evidence favorable to the verdict was properly admitted.
 
 III.
 
 24
 The Finding That Moore was Unable to Obtain Gasoline.
 
 
 25
 We turn first to the question of whether the evidence was legally sufficient to support a jury finding that Moore was unable to obtain a supply of gasoline which would permit him to remain in business. He sought to prove this by showing that no source of supply was available to him after Tide Water ceased deliveries on July 30, 1952.
 
 
 26
 There is no dispute between the parties as to the nature of the proof necessary to warrant a finding that any particular source of supply was not available to Moore. As stated in the trial court's instruction No. 35, to which no objection was taken, it could not be found that a particular source of supply was unavailable to Moore unless it were shown that he offered, on a bona fide basis, to purchase gasoline and diesel fuel oil from such source, and that he was ready, willing, and able to pay the current market price of such source applicable to retail gasoline dealers of Moore's classification and category, and that such source refused to sell to him at its current market price applicable to dealers of that classification and category.
 
 
 27
 Appellants do not question the sufficiency of the evidence to support a jury finding that Moore could not then obtain a supply from appellants Standard, Texas, Richfield, Shell, or Tide Water, or from any source other than appellants. They do, however, question the sufficiency of the evidence to support the finding, inherent in the verdict, that Moore could not then obtain a supply from Union or General.
 
 
 28
 Union's Asserted Refusal to Deal. Viewing the record in the light most favorable to the verdict, we have examined the evidence bearing upon Union's asserted refusal to deal with Moore.
 
 
 29
 There were extensive negotiations between Moore and Union, beginning in the fall of 1951 and continuing to about August 20, 1952. Early in these negotiations, Moore indicated that he would like the same price arrangement on gasoline as he then had with Tide Water. This was a discount of 6 1/2 cents off the posted retail price of regular gasoline, and 7 cents off the posted retail price of ethyl or premium gasoline. He was told that these discounts were a half cent more than the discount Union then gave to Fleet Service Station No. 1. The latter was a truck service station two blocks away, which did somewhat less business than Moore.
 
 
 30
 During the initial meetings, however, the Union representatives did not offer to sell to Moore at the Fleet Service figure. Nor did they state that the figure suggested by Moore was out of the question. Quite to the contrary, on three different occasions late in 1951, W. I. Martin, Union's district sales manager in Seattle, informed Moore that he believed he could get the 6 1/2 and 7-cent price for Moore. The price of diesel oil, Moore was told, would be 10 cents a gallon, as compared to the Tide Water price of 9.2 cents. On each occasion, Moore stated that he would enter into a contract with Union on the 6 1/2 and 7-cent discount basis for gasoline, and 10 cents a gallon for diesel. The third time this price plan was discussed, it was left that Martin would take the matter up with Union's California office.
 
 
 31
 Late in December, 1951, the Los Angeles office advised Martin that the request to take the account on the suggested basis was denied, but that it was agreeable to take the account 'at policy discount.' This counteroffer, however, was never communicated to Moore, and he heard nothing more from Union until February, 1952. A company representative, David E. Gray, then went to the station and told Moore that the company was not 'taking any accounts like ours right then.' There followed some discussion concerning a possible lease of Moore's station to Union. He was later provided with a form of agreement to effectuate such an arrangement. In the middle of March, however, Gray informed Moore that Union was not then leasing any more stations.[9]
 
 
 32
 Union reopened negotiations with Moore in the late spring of 1952. Martin again told Moore that he believed that a discount of 6 1/2 and 7 cents could be obtained for Moore. At a later meeting, T. G. Wise, Union's territory manager, informed Moore that he had authority from a vice president to take the account on that basis. Moore again agreed to contract on this basis, and Wise had a painting contractor measure the station for painting. Two weeks later, however, Martin told Moore that a Union vice president had ruled that it was not in the company's policy to take the account.
 
 
 33
 During all of the period referred to above, Moore was being supplied by Tide Water. Hence, Moore's inability to obtain gasoline from Union during that period bears only indirectly upon the factual question under consideration. As before indicated, the question is whether Moore was unable to obtain a supply after Tide Water terminated deliveries on July 30, 1952. But, as will be seen, Moore's inability to make headway with Union in these earlier negotiations may well have influenced the jury's interpretation of later words and events.
 
 
 34
 The next contact between Moore and representatives of Union came on the morning of Friday, August 8, 1952, when Martin went to Moore's station. By then, Moore was receiving no gasoline from Tide Water or any other source. Moore's version of this conversation is quoted in the margin.[10]
 
 
 35
 This, according to Moore, is the first occasion on which a representative of Union proposed to sell gasoline to Moore at its regular truck station discount of 6 and 6 1/2 cents. This is also the first occasion on which a representative of Union had suggested nine cents a gallon as the price for diesel. In all prior negotiations, beginning in the fall of 1951, the price quoted was 10 cents a gallon, the same as it was charging Fleet Service.
 
 
 36
 The conversation between Moore and Martin just described took place in the morning. About noon of that same day, Martin telephoned Moore. Repeating his previously expressed preference for the 6 and 6 1/2-cent discount proposal involving the 'sixty-day paper,' Moore asked what Martin was going to do. On direct examination, Moore gave this testimony concerning the conversation which followed:
 
 
 37
 'A. * * * He said, 'Well, the sixty-day paper, I find out the company doesn't want any accounts like that. They want a five-year account like that.' 'Well,' I said, 'under those circumstances, I will take the other deal that you outlined this morning for the 5 1/2 cents off of the posted retail price and 9 cents for diesel and no paper at all.' And he said, 'I am sorry we can't take that kind of a deal, either."
 
 
 38
 It was thus demonstrated that Martin had been unable to gain company approval of either of the proposals he had advanced earlier in the day. Moore and Martin, continuing with their telephone conversation, then explored other possibilities. Continuing with Moore's testimony:
 
 
 39
 'So I said, 'Well, what can you do for me? I need gasoline.' And he said, 'Well,' he says, 'we can give you a five-year contract, and give you 6 1/2 cents a gallon off of the posted price of the regular gasoline and 6 1/2 cents a gallon off of the posted price, retail posted price, that is, on ethyl gasoline, and 9 cents for the diesel delivered with a five-year contract.'
 
 
 40
 'Q. Would you stop there a moment, Mr. Moore? A. Yes.
 
 
 41
 'Q. You said 6 1/2 on both regular and ethyl on this transaction; did you mean that? A. No, I meant 6 cents on the regular and 6 1/2 cents on ethyl.
 
 
 42
 'Q. All right. A. And that was to be a five-year contract. I told Mr. Martin I would take the deal, and Mr. Martin said, 'Well,' he said, 'I am sorry, but the price of diesel now is 10 cents'; and I said to Mr. Martin, I says, 'What are you doing, trying to find out how much I can pay for the gasoline and still operate?' I said, 'When you know what you want to sell me the gas and diesel for, come down to the station and let me know, because I want to buy it, but quit horsing around like this, because I am desperate for gasoline."
 
 
 43
 As things then stood, Union had rejected Moore's offer to buy gasoline on a basis of a 6 1/2 and 7-cent discount, with a 10-cent price for diesel. In view of Moore's frustrating experience during the long negotiations, the jury could also well find that Martin's concluding price quotation was not an authorized, firm counteroffer, and that Moore was therefore justified in disregarding it. Assuming such a finding, it was then definitely Union's next move if it was to escape the charge of refusing to deal.
 
 
 44
 Whether Union would have initiated further negotiations with Moore can not be known. Before it had much of an opportunity to do so, Moore had his attorney prepare a letter to Union, dated August 11, 1952, and mailed the next day, offering to purchase from that company all of his supply of gasoline, approximating a specified gallonage a month. He expressed a willingness to purchase at Union's regular prices for similar truck stations in the area. This letter was identical with letters which Moore, on that day, sent to all appellants.
 
 
 45
 Moore might have established his position more positively by ordering a tank wagon of gasoline at Union's prevailing price. The jury, however, was entitled to find that this letter constituted an offer to buy, the disregarding of which would constitute a refusal to deal. But Union did not disregard Moore's letter. In a reply, dated August 15, 1952, and received by Moore on August 18 or 19, Union said: 'We acknowledge and thank you for your letter of August 11, 1952, and advise that our representative will call to see you at an early date.'
 
 
 46
 Since this letter failed to indicate acceptance of Moore's offer, or to present a counteroffer, it was not itself sufficient to avoid the thrust of Moore's offer. But, within the next day or so, Martin went to Moore's station. According to Mrs. Moore, only she and a Frank Wilburn were there at the time. She testified that Martin told her he wanted to talk to her husband about a letter he had received. Mrs. Moore told Martin that her husband had gone out for a moment, and that Martin was welcome to wait. She then excused herself and went out to talk to some former customers. Martin waited not over ten minutes, and then departed, not having seen Moore.
 
 
 47
 Shortly thereafter, Moore returned to the station. Mrs. Moore told him that Martin had been there. Moore asked her if Martin had said anything about selling gasoline. The testimony does not reveal what reply Mrs. Moore made to this inquiry. Moore then asked his wife whether Martin was going to call back. Mrs. Moore replied that Martin did not say. Moore then observed to his wife, 'I guess if he wants to get in touch with me, he will call me.' However, neither Martin nor any other representative of Union thereafter made an effort to contact Moore.
 
 
 48
 Moore testified that his wife had told him that Martin had been to the station and had asked to see Moore. Moore made no effort thereafter to contact Martin or any other representative of Union. When asked why he had not called Martin upon learning of the latter's visit to his station, Moore testified:
 
 
 49
 'A. All right. The reason I didn't call Mr. Martin was that if he had been willing to sell me gasoline and get a good account like that, he would have been down there waiting for me and I would have been ready to buy. I was ready to buy.'
 
 
 50
 Arnold Johnson, a laborer who was in the employ of Moore from December, 1947, to August, 1952, testified concerning a conversation with Martin at the station shortly before the 20th or 21st of August, 1952. At that time, according to Johnson, the station was not in operation, and United Truck Lines was using some of the pumps for its own purposes. On this occasion, United Truck Lines, according to Johnson, was unloading a tanker of gasoline. Johnson asked Martin, no one else being present, if he had come down 'to sell us gasoline.' It is Johnson's testimony that Martin replied: 'No, I come down to see if United Truck Lines was using this fuel for their own purpose.'
 
 
 51
 This testimony was at variance with Johnson's testimony, in a deposition, that he had not talked to Martin, other than to say 'good morning.' It is also in conflict with Mrs. Moore's testimony that no person other than Frank Wilburn was present when Martin called.
 
 
 52
 If Johnson's testimony is to be given full credence, Martin's last call at the station had nothing to do with the sale of petroleum products. Since Union made no other contract with Moore, the finding would justifiably follow that Union had failed to act affirmatively upon Moore's offer to buy at Union's going prices for such a station. This would spell out refusal to deal.
 
 
 53
 But, in view of the disparity between Johnson's testimony at the trial, on the one hand, and his deposition and Mrs. Moore's testimony, on the other, perhaps the jury could not reasonably have found that Martin's last visit was unconnected with Moore's letter. Proceeding on this assumption, and bearing in mind that it was Union's next move, the question then presented is whether Martin made a reasonable effort to contact Moore. If Martin, on this occasion, did all that was reasonably required of Union to find Moore, for the purpose of consummating a sale of gasoline, there was no refusal to deal.
 
 
 54
 In our view, the jury could properly find that something more was required of Union at this late date than Martin's ten-minute and somewhat enigmatic call at a time when Moore was not at his station. A little longer wait at the service station, a telephone call, or a letter stating the basis on which Union would sell gasoline, would have been sufficient. Without anything of this kind, the jury was free to infer that, if Martin really vent to the station to discuss the letter, it was to say 'no.' Union finally said 'no,' the jury could thus conclude, by discontinuing contact while in possession of Moore's written offer.
 
 
 55
 It is therefore our conclusion that the evidence was legally sufficient to support the jury finding that Moore was unable to obtain a supply of gasoline from Union.
 
 
 56
 General's Asserted Refusal to Deal. Again viewing the record in the light most favorable to the verdict, we turn to an examination of the evidence bearing upon General's asserted refusal to deal with Moore.
 
 
 57
 Arguing that the evidence is legally insufficient in this respect, appellants contend that it is uncontroverted that (1) after Tide Water ceased supplying Moore, General offered to supply him with gasoline at General's current tank wagon price; (2) this price was the current market price at which General was then selling or offering to sell gasoline to other service stations of like size and character; and (3) General's offer was refused by Moore.
 
 
 58
 Before considering what transpired between Moore and General after Tide Water ceased deliveries, it will be well to review the evidence favorable to Moore concerning their prior negotiations. In September or October, 1951, Moore telephoned to a Mr. Elmore, who was a branch manager for General. Elmore went to Moore's station the next day. Moore advised Elmore that the Tide Water contract could be terminated. Elmore indicated great interest in taking the account, stating that General needed representation in that area. 'This is a chance that comes to a branch manager once in a lifetime,' he told Moore. Elmore told Moore, however, that it was not in General's policy or program to take the account at that time.
 
 
 59
 In October, November, or December, 1951, a Mr. Falkner, representing General, went to Moore's station. Falkner tried to interest Moore in leasing a station from General on Boren Avenue, in Seattle. Moore looked over the Boren Avenue station and then told Falkner he would take it if he could also get a supply of gasoline for his Fourth Avenue South station. A week later, Falkner told Moore that General would not supply his Fourth Avenue South station. This concluded Moore's negotiations with General at that time.
 
 
 60
 Moore's supply contract with Tide Water terminated at the end of July, 1952. On the afternoon of August 11, 1952, Moore, in company with one of his employees, called at the Seattle offices of several of the appellants, including General. At General's office, he talked with Mr. Elmore. Moore stated that he was running out of gasoline, and offered to buy gasoline for cash. He said nothing about prices on that occasion, and did not ask for a supply contract or a commitment for a permanent supply. Elmore told Moore on this occasion that General was short of gasoline and could not sell any to Moore.
 
 
 61
 Later the same day, Moore sent a letter to General, similar to the letter sent on that day to Union and other appellants, offering to purchase all of his gasoline from General at the latter's 'regular' price. General made no written response. Within two or three days, however, Elmore telephoned to Moore. According to Moore, Elmore asked if Moore would pay 'tank wagon price' for gasoline.[11] Moore's response was that a station like his could not operate on tank wagon prices, but that he was willing to pay the price which a station similar to his would pay. According to Moore's testimony, Elmore then said that he would see what he could do for Moore about getting gasoline. Moore heard nothing more from Elmore or any other representative of General.
 
 
 62
 Albert E. Horn, Jr., General's division manager for Washington, testified that, on August 11, 1952, he authorized the supplying of Moore on a temporary basis at tank wagon prices. He further testified that he instructed Elmore to tell Moore that General would sell him gasoline for his service station on a day-today basis at General's posted tank wagon price until Moore could arrange for a supply elsewhere. According to Horn, Elmore later reported that these instructions had been carried out. Elmore did not testify.
 
 
 63
 The jury was entitled to believe Moore's version of what Elmore told him, and to reject the inference arising from Horn's testimony, that Elmore told him something elso. If the jury accepted Moore's testimony in this regard, it could have found that General did not accept Moore's offer to buy gasoline, and did not make a counteroffer to sell gasoline to Moore. A seller's inquiry of a prospective buyer as to whether the latter would but at an indicated price is not necessarily an offer to sell at that price.
 
 
 64
 Ordinarily, failure to accept, within a reasonable time, an offer to buy, or to make a counteroffer to sell, indicates refusal to deal. This is not always true, however, as the surrounding circumstances may cast such failure in a different light. Thus, if a buyer indicates to the seller in advance that he would not but at the seller's current prices for similar sales, the seller's failure to offer goods at that price does not evidence a refusal to deal.
 
 
 65
 Appellants argue, in effect, that the uncontroverted evidence shows that this is what happened here. They produced testimony to the effect that General was in short supply, and was therefore, at the time in question, operating under a sales policy which precluded the taking on of new accounts at less than tank wagon prices.[12] Moore testified that he told Elmore that he could not operate on that price.
 
 
 66
 Moore testified further, however, that when he told this to Elmore, the latter stated that he would see what he could do. The jury could infer from this that General's price policy was not as inflexible as appellants' testimony would tend to indicate. If such prices were not inflexible, then Moore, with his highgallonage station in a location which Elmore had said was favorable, would be entitled to a discount such as General had previously given other stations, or so the jury could have found.
 
 
 67
 The jury could also have found that Moore was led to believe, by Elmore's closing remarks during their telephone conversation, that there would be further price negotiations. The jury was warranted in reasoning that, if Moore had been advised that General would, in no event, offer better than tank wagon prices, he might have accepted gasoline on such a basis for purposes of a temporary supply. But there were no further price negotiations, and Moore was never told that General Would not offer a lower price. Viewed in this light, the jury was warranted in finding that Moore's offer to buy had, in effect, been rejected, and that no bona fide counteroffer had been made. This is enough to support the ultimate finding that General refused to deal with Moore.
 
 
 68
 We therefore conclude that the evidence was legally sufficient to support the jury finding that Moore was unable to obtain a supply of petroleum products which would permit him to remain in business.
 
 IV.
 
 69
 Proof of Agreement, Combination, or Conspiracy.
 
 
 70
 This brings us to the question of whether the evidence was legally sufficient to support a jury finding that Moore's inability to obtain gasoline resulted from an agreement, combination, or conspiracy among the appellants in restraint of, or to monopolize, interstate trade or commerce.
 
 
 71
 Appellants do not question the sufficiency of the evidence as to the interstate character of the trade or commerce in question.[13] They do, however, contend that the evidence is not legally sufficient to support a jury finding that Moore was refused a supply pursuant to, or in furtherance of, an unlawful agreement, combination, or conspiracy of the kind indicated.
 
 
 72
 As foreshadowed by the pleadings, the agreement, combination, or conspiracy which Moore sought to prove was broad in scope. Its total objective, according to Moore, was no less than effective control and regulation of gasoline prices, and the monopolization, domination, and channelization of gasoline distribution in the Seattle area.
 
 
 73
 In proof of an arrangement between appellants having this breadth of purpose and complexity of design, evidence was submitted concerning a wide variety of asserted supply, marketing, and pricing practices. Included among these were practices relating to the discontinuance of split-pump accounts,[14] public posting of wholesale, or so-called 'tank wagon' prices, granting of discounts from posted prices, withdrawal of discounts and allowances, exchange of price information, exchange of petroleum products between appellants, resale price directives, consignment sales, the socalled 'clearance' program,[15] suppression of curb signs, and refusal to sell to price cutters.
 
 
 74
 An examination of the voluminous record of testimony and exhibits[16] brings us to the view that the evidence does not provide substantial support for a jury finding that all or any of the appellants entered into and carried out an agreement, combination, or conspiracy having the magnitude and ramifications pictured in the complaint.
 
 
 75
 Were this view concerning the sufficiency of the evidence dispositive of the appeal, it would be necessary to here set forth, at least in summary form, a resume of the evidence and our analysis of its deficiencies.
 
 
 76
 Failure to establish, prima facie, the broadly-alleged agreement, combination, or conspiracy does not, however, compel the conclusion that Moore did not make out a case. Concerted refusal to deal is the particular act or practice which is claimed to have damaged Moore. If there is substantial evidence to support a finding that for any reason touching the matter of prices or competition appellants agreed, combined, or conspired to deny gasoline to Moore, or to a class of dealers of which he was a member, and act or practice of that kind, the verdict act or practice of that kind, the verdict withstands appellants' factual challenge.
 
 
 77
 The trend of the evidence favorable to Moore suggests the nature of the limited agreement, combination, or conspiracy of this kind which the jury may have found to exist. It would be an agreement, combination, or conspiracy to control price cutting and curb-sign advertising by refusing gasoline to dealers whose severe price cutting and persistent curb-sign advertising bring them into controversy with their present suppliers.
 
 
 78
 There is substantial evidence that Moore was in this class of dealers. He was not content to hold his price-cutting practices within the limits generally adhered to by other price cutters. During a so-called 'price war' in the spring of 1951, the other dealers dropped their prices from 27 cents a gallon for regular gasoline to 24.9 cents. Moore, however, first lowered his price to 24 cents, and later to 22.9 cents, both times over the strenuous objections of his supplier, Tide Water. Nor did he, for a considerable time, heed Tide Water's insistent request that his curb price signs, advertising this low price, be removed.
 
 
 79
 Moore finally agreed to remove the curb signs, and did so in August, 1951, in consideration of Tide Water agreement to release him from his contract so that he could obtain a supply elsewhere. Moore did not sign the termination papers which were later submitted, however, since Tide Water promised him only a ten-day supply of gasoline. Business relations between Moore and Tide Water deteriorated rapidly from this time on. A half cent of his 2 1/2 cent a gallon discount on gasoline was taken away, and restored only after Moore's attorney negotiated with Tide Water. Moore was put on a C.O.D. basis, and later his Tide Water distributorship on batteries and tires was taken away. In November and December, 1951, according to Moore, Tide Water began delivering poor ethyl gasoline, and continued this for four months.
 
 
 80
 In resisting Tide Water's asserted pressure on him, Moore stopped payment on certain checks (paying them shortly afterwards), and, on occasion, paid for gasoline with small change. On two occasions, he ordered Tide Water employees off his premises.[17] Finally, on May 2, 1952, Tide Water served upon Moore a notice that his contract was being canceled effective July 30, 1952. As before stated, Tide Water's supply to Moore ended on the latter date.
 
 
 81
 There is also substantial evidence that the other appellants refused to deal with Moore after this controversy arose between him and Tide Water. This point has been fully discussed in a preceding section of this opinion.
 
 
 82
 The crucial inquiry, then, is whether there is substantial evidence to support a finding that these other appellants denied service to Moore pursuant to an agreement, combination, or conspiracy of the kind alleged, rather than as a result of a legitimate business decision, independently arrived at, unassociated with any such mutual arrangement or deliberate concert of action.
 
 
 83
 Each such appellant (except Union and General, which deny that they refused to deal) asserts that its individual refusal to deal with Moore, following the development of his controversy with Tide Water, was the result of a legitimate, independent business decision. The principal reasons advanced by individual appellants as to why they were unable to do business with Moore are that the company had a limited supply, which made it impracticable to take on new accounts, or that the company already had a retail outlet very close to Moore's station.
 
 
 84
 On the other hand, evidence favorable to Moore, and reasonable inferences which could be drawn therefrom, present a somewhat different picture.
 
 
 85
 Standard refused to do business with Moore in August, 1952, asserting that its supply position was critical. Considering the record as a whole, however, the jury was not required to accept this explanation. Moreover, there is evidence to indicate that in the previous year, after Moore's controversy with Tide Water arose, and at a time when Standard had no supply problem, it refused to deal with Moore because 'it isn't our policy to take you.' This decision was made after a period of negotiation, during which the parties seemed to reach agreement on prices. During the early part of these negotiations, the Standard representative had appeared anxious to take on Moore's account.
 
 
 86
 Union did not claim lack of gasoline or presence of an adjacent Union station as a reason for not dealing with Moore. Indeed, the position of that appellant is that it was always willing to deal. Yet, the evidence reviewed in a preceding section of this opinion indicates that Union several times rejected Moore's offer, and never quite got around to making a firm counteroffer. This in spite of the fact that representatives of Union who called upon Moore seemed to want his account.
 
 
 87
 General, like Union, claims that it was willing to deal with Moore after Tide Water discontinued, and asserts that Moore rejected its offer to sell at its prevailing market price. In a preceding section of this opinion, however, we have referred to evidence from which the jury could have concluded that Moore's written offer to buy at General's regular prices, communicated to General on August 12 or 13, 1952, was not acted upon. On August 11, 1952, General had orally refused to deal, asserting, as a reason, short supply of gasoline. Yet, as in the case of Standard, the evidence was such that the jury was not required to credit this assertion.
 
 
 88
 In the previous September or October, after Moore's controversy with Tide Water arose, his attempt then to obtain gasoline from General was likewise futile. The company representative who then negotiated with Moore had appeared elated to have the opportunity of his account, but wound up by telling Moore it was not in General's policy or program to do so. General's policy or program appeared not to stand in the way of leasing a Boren Avenue station to Moore, but only to delivering gasoline to the Fourth Avenue South station where he had had difficulty with Tide Water.
 
 
 89
 In June or July, 1952, a Richfield representative, answering Moore's request to open negotiations, gave several reasons why it would be to Moore's advantage to deal with Richfield. He was told that, while Moore's contract with Tide Water was a 'longer deal' than Richfield was accustomed to, it was believed the Tide Water price could be matched. Moore was also told that it would make no difference that Richfield then had a station across the street. Richfield's Los Angeles office, however, rejected Moore's business for the asserted reasons that he was a price cutter and his discount practices would be 'upsetting' to other Richfield accounts. Moore was not given this reason, but was told only that the deal was off.[18]
 
 
 90
 Moore made no attempt to purchase gasoline from Shell until 2:30 p.m., on August 11, 1952. This was twelve days after his Tide Water source had been terminated. On this occasion, Moore was told that Shell would not sell gasoline to him because there was a service station across the street. The representative who told this to Moore, however, stated that Shell would have solicited Moore's business had not Tide Water told Shell that Tide Water owned the 10,000-gallon tank on Moore's premises. This tank actually belonged to Moore. Replying to Moore's letter of August 11, 1952, offering to buy all of his gasoline from Shell, the company gave two reasons for refusing his business. One of these was that it would be a violation of antitrust laws to enter into an exclusive dealership arrangement. The second reason was that Shell products were then being marketed at the nearby Flajole Bros. Shell station.
 
 
 91
 Moore made no effort to purchase gasoline from Texas until August 11, 1952. On the afternoon of that day, he went to the Texas office in Seattle and offered to buy gasoline for cash. He was denied a supply, on the ground that Texas had a company-owned station two blocks down the street. The company representative told Moore: 'The Texas Company has lots of gasoline and is actively soliciting business but you are too close to us and we won't sell you.' The same position was taken in that company's reply to Moore's letter of August 11, 1952.
 
 
 92
 The refusal of all of these appellants to deal with Moore, after the disagreement arose between him and Tide Water, was prophetic fulfillment of statements made to him by Tide Water representatives. While they were trying to bring him into line on prices and use of curb signs, officials of that company told him, 'We can break a service station operator like you if you don't do what you are told on these price signs'; 'If you don't take the price sign down, when I get through with you no company in town will sell you gas'; 'You are being foolish to get the companies mad at you like this for not taking the price sign down.' This sort of threat could well lead the jury to infer that Tide Water felt assured that its pressure on Moore would find support from the other appellants.
 
 
 93
 Moore was not alone in finding that severe price-cutting practices seemed to close the gates to all sources of supply.[19] Extensive evidence was presented concerning the difficulties experienced by seven aggressive price cutters in obtaining a supply of gasoline. The two instances of this kind most favorable to Moore involved a 'Gasoteria' operation by one John Brady, and a General dealer named Victor W. Markov.
 
 
 94
 All appellants except Shell (but including Shell's predecessor) either rejected in writing Brady's offer to buy gasoline, or failed to respond to his offer. In making this solicitation, Brady had advised each of these companies that he operated a self-service 'Gasoteria' station, and that it was his policy to sell gasoline at a discount of three or four cents a gallon off the general retail price. When this solicitation was made, his current source of supply, Clipper Oil Company (which then obtained its gasoline from Texas), had been cut off, due to a controversy which had nothing to do with prices. This quarrel with Clipper was soon settled, and Brady resumed operations. Between 1949 and 1952, Brady endeavored to obtain his gasoline from Texas, General, and Standard, but without success. In 1952, however, he did obtain a substantial amount of gasoline from Signal Oil Company. Signal was then an operating division of Standard.
 
 
 95
 Markov got into difficulties with his then supplier, General, during the 1951 'price war,' when he dropped his prices and thereby substantially increased his sales. General tried to get Markov to raise his prices, but he refused. General then discontinued sales to Markov, but leased his station and continued to deliver gasoline on a consignment basis. This required Morkov to sell at prices fixed by General. When Markov demanded permission to lower his prices, General canceled his consignment contract. It then raised his wholesale price to the tank wagon level. Sales continued on this basis to the time of the trial.
 
 
 96
 In September, 1952, Markov, who then had a reputation as a price cutter, attempted to obtain gasoline from each of the other appellants except Tide Water. Standard turned him down on the ground that it was experiencing a shortage of supply. Shell and Union advised Markov that they were not interested because they were selling to other service stations in the vicinity.[20] Texas told Markov that it was not interested in taking on new business. Richfield declined to sell to Markov because of its 'fair trading' policy.
 
 
 97
 There is in the record other evidence tending to indicate concert of action among appellants in suppressing curb price signs. In the case of General, there was testimony that the action of Markov in displaying price signs was reported by Union, Richfield, and General employees to their respective Los Angeles offices.
 
 
 98
 A former Richfield employee testified that he was under instructions to report to his office when signs were displayed at the service stations of other dealers. When he reported the presence of such signs displayed by competitive dealers, 'the signs usually came down.'
 
 
 99
 Moore, who was a Tide Water dealer, testified that a salesman for Texas, in urging Moore to take down his price sign, stated: 'It is in the program to get the price signs down on the Avenue and clean up the Avenue.' Moore also testified that, during a 1950 'price war,' a representative of his supplier, Tide Water, told him that the company would not sell Moore any more gasoline until he took his price sign down. A Shell station across the street was also displaying such a sign at that time. The Tide Water representative told Moore, 'I will have that sign down in five minutes from the time yours is down.' Moore took his sign down. The Tide Water man then went to a telephone and made some calls. The Shell sign came down within five minutes.
 
 
 100
 A retail dealer of Chevron (Standard) products was told by a Standard salesman that if he took his sign down, the signs of other dealers 'would be down as soon as possible.' This dealer testified that stations in his area representing three or four major oil companies took their signs down about the same time that he did. Some of the exhibits show that Seattle representatives of Tide Water made surveys of the price sign situation in Seattle, determining the name, address, and oil company represented, for use by its San Francisco office.
 
 
 101
 The foregoing resume deals with what we regard as the most significant evidence favorable to Moore bearing directly upon appellants' apparent unanimity of action and possible contact with each other concerning severe price cutters and persistent displayers of curb price signs. There is a great deal of additional evidence, however, tending to show parallel action by appellants, or actual contacts and communications between them, concerning other supply, storage, marketing, and pricing practices. The significance of evidence of this kind lies in its tendency to picture a business setting and relationship which invites inferences favorable to Moore's position.
 
 
 102
 Among the matters dealt with in the evidence of this character are (1) the apparently concurrent and uniform act of all appellants, in 1936, (excluding Shell but including its predecessor) in discontinuing 'split-pump' accounts in the Seattle area, and requiring each retail dealer to obtain his supply exclusively from one oil company;[21] (2) the practice of all appellants in posting their respective tank wagon prices in conspicuous public places, with the resulting tendency towards uniformity as to the wholesale prices of all appellants;[22] (3) the uniform practice of all appellants in allowing unpublished discounts from the posted prices to selected dealers; (4) the practice of all appellants in exchanging petroleum products with each other to meet special supply or storage problems as they developed; and (5) the uniform practice of all appellants whereby they would not undertake to serve a retail dealer already in business without contacting his present supplier and obtaining 'clearance.'
 
 
 103
 The summary of the evidence, as set out in this section of the opinion, is necessarily fragmentary, as compared to the bulk of the entire record. Moore will be able to point to items of evidence in his favor which have not been mentioned. Appellants will be able to show that a more complete review of the evidence here adverted to would suggest weaknesses in Moore's case not apparent from a reading of this opinion. Our purpose has been only to indicate, in a general way, the lines of evidence which have a tendency to lead in the direction of the jury verdict.
 
 
 104
 This evidence, of course, is largely circumstantial. The fact that the evidence is circumstantial, however, does not necessarily affect its sufficiency to support a finding of agreement, combination, or conspiracy. Such arrangements, as the Supreme Court has said, 'are seldom capable of proof by direct testimony, and may be inferred from the things actually done * * *.' Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 611, 612, 34 S.Ct. 951, 954, 58 L.Ed. 1490.[23]
 
 
 105
 That the evidence tending to prove a fact is wholly circumstantial is not ground for setting aside a finding of such fact unless, as a matter of law, reasonable minds, as triers of fact, must be in agreement that some reasonable hypothesis other than the existence of such fact could be drawn from the evidence. Elwert v. United States, 9 Cir., 231 F.2d 928, 935. In applying this test, the evidence is to be viewed as a whole and not link by link. C-O-Two Fire Equipment Co. v. United States, 9 Cir., 197 F.2d 489, 494, certiorari denied 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690.
 
 
 106
 Where the circumstantial evidence favorable to the verdict meets this test, an appellate court will not 'search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences.' Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520.
 
 
 107
 A considerable part of the evidence reviewed above concerned the acts of individual appellants and of their agents or employees, and the extrajudicial declarations of such agents or employees. In evaluating evidence of this kind, it must be kept in mind that evidence of such acts and extrajudicial declarations are not to be considered as against other alleged members, unless there is independent evidence establishing, prima facie, that such others were members of the conspiracy. Glasser v. United States, 315 U.S. 60, 74-75, 62 S.Ct. 457, 86 L.Ed. 680.[24]
 
 
 108
 Part of the evidence, as previously noted, concerned asserted instances of parallel action knowingly taken, rather than actual contracts and communications between appellants. Consciously parallel business behavior in matters touching prices and competition does not itself constitute a Sherman Act offense. It is, however, admissible circumstantial evidence of an underlying agreement, combination, or conspiracy concerning such matters. The probative value of such evidence is to be determined by the trier of the facts. Theatre Enterprises, Inc., v. Paramount Film Distributing Corp., 346 U.S. 537, 540-541, 74 S.Ct. 257, 98 L.Ed. 273.[25]
 
 
 109
 A merchant is ordinarily entitled to develop business relationships with whom he pleases. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. Accordingly, the act of an individual person or company in refusing to deal with another usually does not, standing alone, have antitrust significance. There are some exceptions to what has just been said, as noted in the Report of the Attorney General's National Committee, supra, 134-136. We need not determine whether the record contains a factual basis for applying any of these exceptions against Tide Water or any other appellant. This is true, because the theory of this action, as set out in the pleadings and unchallenged instructions, and as argued to the jury, does not admit of a verdict based upon individual refusal to deal. The only injury for which Moore sought damages was that said to have resulted from an unlawful agreement, combination, or conspiracy.[26]
 
 
 110
 Where an act or practice of refusing to deal is shown to be pursuant to, or in furtherance of, an agreement, combination, or conspiracy, Sherman Act liability is encountered. It is now well established, and is not here questioned, that an agreement, combination, or conspiracy between two or more persons engaged in interstate commerce, to withdraw or withhold custom from another, or with a class of others, is violative of the antitrust laws.[27] Concerted restraint of this kind is illegal, even if intended to meet or overcome an admittedly invidious trade practice.[28]
 
 
 111
 Evidence tending to show that there was a legitimate business reason for the act of an individual merchant in refusing to deal is always admissible in contradiction of a case built upon circumstantial evidence. But, if there is sufficient evidence to support a finding that a merchant entered into such an agreement, combination, or conspiracy, the fact that his individual refusal to deal may be explainable as a reasonable business decision is not excusatory of liability. He will be deemed to have set in motion an illegal undertaking, and will be held accountable for damage caused by the overt act of any member, pursuant to or in furtherance of the plan.
 
 
 112
 This is but an application of the general law of conspiracy. See Marron v. United States, 9 Cir., 8 F.2d 251, 258. It is based upon the principle that a conspiracy creates an agency relationship, and that therefore each member is authorized by the other members to perform acts in furtherance of the common objective. Las Vegas Merchant Plumbers' Ass'n v. United States, 9 Cir., 210 F.2d 732, certiorari denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645.
 
 
 113
 No express agreement, of course, is necessary to constitute an unlawful combination or conspiracy. American Tobacco Co. v. United States,328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575. It is sufficient if persons, with knowledge that concerted action was contemplated and invited, 'give adherenceto and then participate in a scheme.' Federal Trade Commission v. Cement Institute, 333 U.S. 683, 716, 68 S.Ct. 793, 811, 92 L.Ed. 1010.
 
 
 114
 Viewing this evidence, as we are required to, in the light most favorable to Moore, and having in mind the applicable rules and principles to which reference has been made, we hold that the jury finding of agreement, combination, or conspiracy, and resulting overt act, is supportable as against all appellants.
 
 
 115
 As to all appellants, the evidence is sufficient to support a jury finding of agreement, combination, or conspiracy to control price cutting and curb-sign advertising by refusing gasoline to dealers whose severe price cutting and persistent curb-sign advertising bring them into controversy with their present suppliers. The evidence is sufficient to support a jury finding that, in 1951 and 1952, Moore became such a dealer, and that, pursuant to and in furtherance of the agreement, combination, or conspiracy, the appellants withheld their custom.
 
 V.
 
 116
 Admissibility of Exhibits Received in Proof of Agreement, Combination, or Conspiracy.
 
 
 117
 Hundreds of exhibits were offered and received in evidence in proof of the alleged unlawful agreement, combination, or conspiracy. Most of these consist of photostatic copies of documents found in the Seattle and California files and records of appellants. These documents had been made available in response to orders to produce. They consist largely of the originals or copies of letters, telegrams, memoranda, and reports. Some were handwritten, some were typewritten, and others were mimeographed or printed.
 
 
 118
 It is not questioned on this appeal that the photostatic copies are accurate reproductions of the documents in question, or that the documents came from appellants' files and records. Appellants objected to the introduction of most of these exhibits, however, on the ground, among others, that they constitute hearsay, and that no foundation had been laid for their admission under any exception to the hearsay rule.
 
 
 119
 In nearly every instance where such an objection was made, it was overruled and the exhibit was admitted in evidence. The trial court held that exhibits of this kind which were received in evidence were admissible under the exception to the hearsay rule which applies to business records.[29] In the federal courts, this exception is sanctioned by statute.[30]
 
 
 120
 Appellants argue that the admission of these exhibits on this ground and over appellants' objection constituted prejudicial error. While several hundred exhibited of this kind are said to have been improperly admitted, our attention is specifically directed to 119 such exhibits. In their specifications of error, appellants provide detailed record references and arguments as to 46 of these exhibits, contending that they exemplify both the impropriety of what was done and the prejudice which resulted. Six exhibits or series of exhibits, selected for illustrative purposes, are dealt with at length in the briefs.
 
 
 121
 Most of the memoranda, letters, and telegrams introduced in evidence in this fashion consisted of interoffice communications between officials of the same company. Many of these communications dealt with such matters as the marketing and pricing policies and activities of the company, of other oil companies, or of customer or competing service station operators. Others dealt with problems of supply, plant and service station facilities, or competition. Some of the communications provided factual information. Others contained expressions of opinion, suggestions, instructions, or requests for information.
 
 
 122
 In addition to these interoffice communications, there were many memoranda from salesman or other field representatives to their superiors. These memoranda were largely used to report the observations of the writer, or information supplied by others, concerning the marketing and pricing policies and practices of other oil companies and of customer or competing service station operators. These field memoranda were sometimes handwritten on printed memo forms supplied for the purpose.
 
 
 123
 A number of the exhibits were reproductions of weekly reports or surveys of highest, lowest, and average prices posted at retail outlets in specified areas.
 
 
 124
 Admissibility as Business Records. To be admissible under 28 U.S.C.A. 1732, the writing must have been made 'as a memorandum or record' of some 'act, transaction, occurrence, or event.' The memorandum or record must have been made in the 'regular course' of the business. It must also have been in the regular course of such business to make the memorandum or record 'at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.'
 
 
 125
 The probability of trustworthiness of memoranda and records made and maintained as provided in 1732 lies in the fact that they are routine reflections of the day-to-day operations of the business in whose files the memoranda and reports are found. Palmer v. Hoffman, supra, 318 U.S. at pages 113-114, 63 S.Ct. 477. The matters which reflect the day-to-day operations of a commercial enterprise are those in which it is directly concerned as a participant. Illustrative of these are such matters as bids, offers, purchases, sales, deliveries, price quotations, credit extensions, loans, rentals, salary and wage payments and deductions, inventory changes, and bank deposits.
 
 
 126
 It follows that a writing which does not pertain to a matter in which the business was a direct participant, but to some incident, circumstance, or activity outside that business, is not a memorandum or record of an 'act, transaction, occurrence, or event' within the meaning of the statute. In this event, the writing is not admissible under 1732, notwithstanding it may have been made in keeping with systematic and routine procedures, and concerns a matter of importance to the business. See Palmer v. Hoffman, supra; Clainos v. United States, 82 U.S.App.D.C. 278, 163 F.2d 593.
 
 
 127
 A great many of the exhibits in question consist of memoranda, letters, and reports dealing with the pricing and marketing policies of oil companies other than the one in whose files the writing was found. Other such exhibits deal with the like policies and practices of service station operators who were not customers of the company in whose files the writing was found. For the reasons just stated, such writings are not business records, and should not have been admitted under 1732.
 
 
 128
 The considerations discussed above and the context of 1732, read as a whole, also indicate that a writing cannot ordinarily be considered a 'memorandum or record' of an 'act, transaction, occurrence, or event,' unless the recitals in such writing are factual in nature. There are special circumstances under which writings containing expressions of opinion or conclusions, as distinguished from factual statements, may be admissible under the statute. This may be done, however, only where the subject matter is such that the expression of an opinion or conclusion calls for professional or scientific knowledge or skill, and where the opinion or conclusion is expressed by one having the required special competence and authorized to do so by the person or company maintaining the memorandum or record.[31]
 
 
 129
 A good many of the exhibits in question contain expressions of opinion, or conclusions, concerning the reason why another oil company or a noncustomer service station operator took, or failed to take, certain action, or concerning the probable course such companies or persons would follow in the future. Expressions of opinions or conclusions on such matters do not call for professional or scientific knowledge or skill. It follows that exhibits containing such recitals were not admissible under 1732.
 
 
 130
 A memorandum or record cannot be considered as having been made in the 'regular course' of business, within the meaning of 1732, unless it was made by an authorized person, to record information known to him or supplied by another authorized person. The second paragraph of 1732(a) expressly provides that the entrant or maker need not have personal knowledge of the matters recited in the memorandum or record. Wheeler v. United States, 93 U.S.App.D.C. 159, 211 F.2d 19, 23, certiorari denied 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140. But where the entrant or maker records information supplied by others, it must appear that 'it was part of their regular course of business to report to him what the declarants themselves knew, as it was part of his business to record what they said.' United States v. Grayson, 2 Cir., 166 F.2d 863, 869.[32] Where the information comes to the entrant or maker from unauthorized persons, the memorandum or record is therefore inadmissible, not because it contains hearsay, but because it was not made in the regular course of business.
 
 
 131
 With regard to some, but not all, of these exhibits, there was evidence to indicate that the writing had been prepared in the course of the writer's duties as an employee of the company maintaining the record. In many of these exhibits, however, there is information which the writer attributed to others. This is particularly true with respect to memoranda from the field. In few, if any, of these instances was any showing made that the person supplying such information to the writer had the duty to do so. In most cases, the lack of such authority is self-evident, for the information was attributed to a service station operator or other person having no relationship with the company which could give rise to such a duty.[33] Exhibits falling in this category were not admissible under 1732.
 
 
 132
 A memorandum or record cannot be considered as having been made in the 'regular course' of business, within the meaning of 1732, unless it was made pursuant to established company procedures for the systematic or routine and timely making and preserving of company records.[34]
 
 
 133
 As before noted, it was established with regard to some, but not all, of these exhibits that the writing had been prepared in the course of the writer's duties as an employee of the company. On a good many of the papers, there were initials or other marks to indicate that the communication, after being transmitted, had come to the notice of one or more of the company's officials. In most instances, however, it was not established that the internal procedures of the company required that such writings be prepared, transmitted, and filed systematically, or as a matter of routine.
 
 
 134
 Concerning almost all of the items comprising the grist of interoffice memoranda and letters which were introduced, the nonexistence of any such company procedure seems almost self-evident. They were patently intended as communications between employees, and not as records of company activity. Many of them were casual and informal in nature, seeking or providing information of a kind which could be, and no doubt often was, communicated by telephone or in conference. Most of them were apparently written as a result of the exercise of individual judgment and discretion.
 
 
 135
 If there was any systematic or routine procedure being followed in the preparation and filing of such writings, the burden was upon appellee to prove it. He failed to do so, at least with regard to most such exhibits. Where this foundation was lacking, the exhibit was not admissible under 1732.[35]
 
 
 136
 With regard to few, if any, of these exhibits was there testimony indicating that it was a regularly established business procedure to make such memoranda or records at the time of the act, transaction, occurrence, or event therein described, or within a reasonable time thereafter. In numerous instances, the writings themselves reveal that they had not been prepared with any particular or general time limit in mind. Some of the documents contain references to acts which occurred or policies which were established a considerable time before the writing was prepared. Others do not refer to past acts and events at all, but contain predictions as to what would or should occur in the future. Exhibits unsupported by foundation evidence showing adherence to company procedures calling for prompt preparation of the writing were not admissible under 1732.
 
 
 137
 In reaching the conclusions stated above, concerning the lack of adequate foundation to warrant the admission of these exhibits under 1732, we have not overlooked the decisions relied upon by appellee. For the reasons stated below, we believe that they do not support appellee's position.
 
 
 138
 Southard v. United States, 9 Cir., 218 F.2d 943, involves 1733, not 1732. In Sheehan v. Municipal Light & Power Co., 2 Cir., 151 F.2d 65, it was held that copies of certain letters were admissible under the predecessor statute (28 U.S.C.A. 695). These copies, however, did not constitute hearsay. They were not admitted to prove the truth of the contents, but only to show that notice of certain action had been given. In Waters v. Kings County Trust Co., 2 Cir., 144 F.2d 680, certiorari denied, 323 U.S. 769, 65 S.Ct. 121, 89 L.Ed. 615, the question was whether the administration of a trust is a 'business,' within the meaning of the business records act. It was not questioned that the writings, consisting of a bank's history sheet or diary of events, were otherwise admissible under the act.
 
 
 139
 Landay v. United States, 6 Cir., 108 F.2d 698, 704, certiorari denied, 309 U.S. 681, 60 S.Ct. 721, 84 L.Ed. 1024, concerned the admissibility of corporate books to prove certain stock transactions between corporations. They were identified by the one who superintended the making of the records, and the entries were, the court said, 'prepared in the ordinary routine, which warrants their reliability.' In Stillman v. United States, 9 Cir., 177 F.2d 607, it was held only that a proper foundation had been laid for the introduction of certain business records, where a partner had admitted that they were 'the books' of the partnership.
 
 
 140
 United States v. General Motors Corporation, 7 Cir., 121 F.2d 376, 409, certiorari denied, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, comes the closest to supporting appellee's position. It is stated in that opinion that intracompany reports are admissible, under the predecessor business records act, 'as recorded acts or transactions made in the regular course of business.' The court went on to say, however, that most of the errors assigned in connection with this class of evidence were not argued, and that the appellants admitted that none of such evidence was prejudicial in and of itself, though its cumulative weight might influence the jury. The court expressly stated that the appellants 'could not possibly have been prejudiced or injured' by the reception of such evidence either in isolation or in its entirety.
 
 
 141
 In discussing the admissibility, under 1732, of the exhibits introduced in the case before us, it has not been practicable to deal individually with the hundreds of items which were offered and received. It has been our purpose, however, to outline the factors to be considered in ruling upon these or other like exhibits offered on a different record at a new trial.
 
 
 142
 In our view, there was an inadequate foundation for the admission, as business records, of most of these exhibits.
 
 
 143
 The objections which appellants voiced to the introduction, under 1732, of the exhibits in question were sufficient to present all of the considerations which have been discussed above.
 
 
 144
 That the introduction of these exhibits was prejudicial to appellants is not denied. All of the 46 exhibits mentioned in the specifications of error were referred to, and many were quoted, in the argument to the jury made on behalf of appellee. A great many additional exhibits of this kind are referred to in appellee's brief as providing evidence of an unlawful agreement, combination, or conspiracy.
 
 
 145
 If none of these inadmissible exhibits had been received, the evidence would have been insufficient to support the jury finding that there was such an unlawful agreement, combination, or conspiracy. If we were able to say that this evidence would not be admissible on any record which could be made, and is irreplaceable, we would be warranted in directing dismissal of the action.
 
 
 146
 On a new trial, however, a proper foundation may be supplied for the admission of some of these documents, and other admissible evidence may be found in substitution of evidence here found to be inadmissible.[36] The attainment of substantial justice therefore requires quires that the action be not dismissed, but that it be remanded for a new trial. See 28 U.S.C.A. 2106; Rule 61, Federal Rules of Civil Procedure, 28 U.S.C.A
 
 
 147
 Admissibility as Extrajudicial Admissions of a Party-Opponent. Appellee, however, argues that, if these exhibits were inadmissible under 1732, they were, in any event, properly received as extrajudicial admissions of a party-opponent (herein referred to as admissions). To this contention, appellants reply that (1) the course of the trial precludes sustaining the introduction of the documents as admissions; and (2) there was no foundation for introduction of the documents as admissions.
 
 
 148
 Turning to the first of these points, it is appellants' position that the challenged exhibits were offered and received only on the ground that they were business records admissible under 1732. The possible admissibility of these exhibits as admissions having assertedly not been raised and inquired into at the trial, they should not now, appellants argue, be held admissible on the latter ground.
 
 
 149
 Examination of the record indicates that appellant are correct in stating that these exhibits were admitted as business records, and not as admissions. Counsel for Moore, on two or three occasions, sought to admit documents of this kind as admissions. Each time, the trial court rejected this contention, and made it clear that the writings were receivable, if at all, only as records made in the regular course of business. Conforming to this ruling, the foundation evidence was directed only to the requirements of 1732 as a ground for admission.[37]
 
 
 150
 All of the discussion and argument of counsel concerning the admissibility of individual exhibits, with the possible exception noted in the last footnote, were directed to that inquiry. Likewise, the comments of the court regarding the ground of admissibility concerned only that line of inquiry. As a result, the challenged exhibits were received only on the basis that they constituted memoranda or records made in the regular course of business.
 
 
 151
 In view of what has been said, it would be manifestly unfair for us to now hold these exhibits admissible on a different ground, assuming that the evidence in the record would support such a ruling. Appellants have had no trial court opprotunity to inquire into the factual basis for admission of the exhibits on any ground other than that they were business records.[38]
 
 
 152
 Upon a new trial of this action, Moore may seek introduction of some or all of these documents as admissions. We therefore consider it appropriate to state the principles to be applied in the event this effort is made. We speak here not of the foundation which must be laid to establish the authenticity and genuineness of such writings.[39] Our purpose is to indicate what showing Moore must make to warrant a determination that a properly authenticated document may be received, as an admission, to prove the truth of the statements therein made.
 
 
 153
 Extrajudicial admissions of a party-opponent are receivable as exceptions to the hearsay rule.[40] In our case, the documents consist of the writings of employees and agents of the companies against which, at a new trial, they would be produced. To obtain their reception as admissions, it must therefore be made to appear that the statements in question were made or acted upon under circumstances which require appellant corporations to accept responsibility for them as admissions.
 
 
 154
 The writings here in question were, for the most part, prepared and transmitted by employees and agents of the appellant company in whose files the documents were found. However, they were not, with a few exceptions, communications to persons outside such company. They were interoffice memoranda, letters, telegrams, reports, and the like. It follows that there is here no room for application of the rule[41] that the statement is the principal's if the agent or employee was authorized to make it to a third person. A report made by an employee or agent to his principal, and not to a third person, is not, as such, the principal's statement or extrajudicial admission.[42]
 
 
 155
 If, however, a corporation, through its shareholders, board of directors, or authorized management officials, vouches for part or all of an employee's or agent's statement, then the part vouched for is receivable against the corporation as an adoptive admission. It is not necessary, in such case, to show that the statement was expressly vouched for. If authorized management officials direct that business be conducted in reliance upon a particular intramural statement or report, and it is so conducted without reservation, the company has, by implication, adopted the statement or report, and is chargeable with it as an extrajudicial admission.
 
 VI.
 
 156
 Cautionary Instructions Concerning Acts or Extrajudicial Declarations of Coconspirators.
 
 
 157
 As stated in a preceding section of this opinion, evidence concerning the acts and extrajudicial declarations of one member of an asserted agreement, combination, or conspiracy are not to be considered as against other alleged members unless there is independent evidence establishing, prima facie, that such others were members of the conspiracy.
 
 
 158
 When evidence of this kind is received, a cautionary instruction should be given to the jury, to be repeated at the end of the trial, calling attention to the limited effect to be given to such evidence.
 
 
 159
 Appellants complain of the cautionary instruction here given, asserting that the jury was not clearly told that, in order to impose liability upon any individual appellant, Moore had to connect that appellant with the alleged agreement, combination, or conspiracy, by evidence apart from the acts and declarations of any other appellant. Instead, according to appellants, the court permitted the jury to determine the complicity of one appellant from evidence of the acts and declarations of others.
 
 
 160
 Appellee argues that appellants are giving the trial court's cautionary instructions a strained construction, and that appellants did not, during the trial, point to the asserted defect they now rely upon.
 
 
 161
 Since the case must now be returned for a new trial, it is sufficient for us to say that the cautionary instruction dealing with this matter should clearly indicate that evidence of the acts and extrajudicial declarations of the agents and employees of one appellant is not to be considered in determining whether another appellant entered into the asserted agreement, combination, or conspiracy. However, if the jury finds, from substantial evidence independent of the acts and extrajudicial declarations of the agents and employees of other appellants, that a particular appellant entered into such an arrangement, then the evidence of such acts and declarations may be considered on the question of whether an overt act was committed pursuant to, or in furtherance of, the agreement, combination, or conspiracy.[43]
 
 VII.
 
 162
 Admissibility of Evidence Relating to Damages.
 
 
 163
 Appellants question, in several particulars, the admissibility of certain evidence adduced by , moore on the question of damages. Since these questions may again arise on a new trial of this action, we here state our views.
 
 
 164
 The Hypothetical Question as to Good Will Value. It was Moore's contention that his business had been totally destroyed on August 15, 1952, when he could no longer obtain gasoline. He therefore asked the jury to measure his damages by the market value of the business on that date. Moore owned the land and the other capital assets of the business, and retained them when he went out of business. It follows that the only value which his business had before it was closed that it did not have afterwards was its 'going concern' or 'good will' value.
 
 
 165
 As one means of proving going concern or good will value, Moore produced the opinion testimony of an expert witness. The hypothetical question asked of this witness included, as one of its assumptions, that in August, 1952, Moore was forty-one years of age, was in reasonably good health, and wanted to continue the management of the service station. Appellants argue that the question, as so framed, was irrelevant to the issue.
 
 
 166
 We agree. In measuring the value of the good will of such a business, appropriate factors to be considered are: (1) What profit has the business made over and above an amount fairly attributable to the return on the capital investment and to the labor of the owner? (2) What is the reasonable prospect that this additional profit will continue into the future, considering all circumstances existing and known as of the date of the valuation? See Kimball Laundry Co. v. United States, 338 U.S. 1, 16-17, 69 S.Ct. 1434, 93 L.Ed. 1765. These are the factors which would influence a prospective purchaser. The special value which the business might have to Moore, or the profit potential of the business beyond that which would be transferable to a purchaser, would have no effect on market value of the business.[44] Upon the retrial, the question should be framed to omit this irrelevant factor.
 
 
 167
 Appellants also contend that the hypothetical question, as asked, omitted the recital of many fundamental facts which were in evidence, and assumed basic facts contrary to the uncontradicted record.
 
 
 168
 We have no way of knowing what evidence will be in the record upon a retrial, on the basis of which a new hypothetical question may be asked. It will therefore serve no useful purpose to express an opinion as to whether the hypothetical question now before us, measured by the evidence in this record, is subject to the criticism leveled at it by appellants.
 
 
 169
 In general, it may be said that a hypothetical question should include any undisputed fact which is clearly meterial and important.[45] The parties, however, are often not in agreement as to what facts are undisputed, material, and important. If it is objected that certain facts should be included, it is for the trial judge, in the exercise of his discretion, to determine whether the question should be reframed to add such facts. Pasadena Research Laboratories v. United States, 9 Cir., 169 F.2d 375, 384, certiorari denied, 335 U.S. 853, 69 S.Ct. 83, 93 L.Ed. 401.
 
 
 170
 If the trial judge does not require this to be done, it is seldom that prejudicial error can be said to result. This is because the objecting party can, through cross-examination, expose to the jury the asserted deficiencies of the hypothetical question as asked. Dunagan v. Appalachian Power Co., 4 Cir., 33 F.2d 876, 68 A.L.R. 1393, certiorari denied, 280 U.S. 606, 50 S.Ct. 152, 74 L.Ed. 649. It is for this reason that it is usually held that defects in such a question go not to the competency of the evidence, but merely affect its weight. Permanente Metals Corp. v. Pista, 9 Cir., 154 F.2d 568, 569.
 
 
 171
 A hypothetical question calling for expert opinion must be based upon facts in evidence. Hupp Motor Car Corp. v. Wadsworth, 6 Cir., 113 F.2d 827. There is here less leeway for the exercise of discretion, since the determination of whether certain facts are in evidence is not so dependent upon judgment factors as the determination of whether certain facts are undisputed, material, and important. Even where it is found that facts assumed in the hypothetical question are not in evidence, however, it is not often that prejudice results. This, again, is because the exercise of the right of cross-examination makes it possible to illuminate any false assumptions contained in the hypothetical question .[46]
 
 
 172
 Qualifications of Expert Witness. The witness from whom Moore's counsel sought an expert opinion as to value of the business was Dr. Henry Burd. Dr. Burd taught marketing at the University of Washington From 1924 to 1954. Since then, and until the trial, he was engaged in business as a consultant in marketing fields. Appellants concede that Dr. Burd was eminently qualified in many phases of marketing, but argue that he was not qualified by study, training, or experience to state an opinion on the salable value of Moore's service station.
 
 
 173
 In determining whether a particular witness is qualified to express an expert opinion, the trial court is called upon to exercise a sound discretion. Pollard v. Hawfield, 83 U.S.App.D.C. 374, 170 F.2d 170, certiorari denied, 336 U.S. 909, 69 S.Ct. 514, 93 L.Ed. 1073. Whether the witness has had occupational experience in the particular field embraced by the hypothetical question is a factor to be considered in determining his qualifications. But it is not controlling. The court may find that it is sufficient that such witness is qualified by study, research, and general background, to express an opinion. Empire Oil & Refining Co. v. Hoyt, 6 Cir.,112 F.2d 356; 2 Wigmore, Evidence (3d ed. 1940) 556.
 
 
 174
 Our examination of the record convinces us that the trial court did not abuse its discretion in permitting Dr. Burd to express an expert opinion as to the value of Moore's gasoline service station business.
 
 
 175
 Formula Used to Measure Going-Concern Value. In expressing an opinion as to the going-concern value of Moore's business, Dr. Burd used a formula which allocated average profit to (1) capital investment, (2) value of personal services, and (3) 'good will,' and which capitalized the latter derived figure at various postulated percentages.
 
 
 176
 Appellant state that nowhere did Dr. Burd explain why the formula which he used was reasonable under the circumstances. Thus, it is contended, his testimony is subject to the same objection which was upheld in Emich Motors Corp. v. General Motors Corp., 7 Cir., 181 F.2d 70, 83, modified on another ground, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534.
 
 
 177
 Without undertaking to say that the lack of background testimony explaining the formula used by Dr. Burd was a fatal defect, we express the view that it would have been better practice to have such an explanation from the witness. The outline of Dr. Burd's formula seemed to follow rather closely the prime factors mentioned in Kimball Laundry Co. v. United States, supra. But the jury should have had hi reasons for adopting the particular formula and its component factors and assumptions. This deficiency can be supplied upon the retrial.
 
 
 178
 Opinion Based upon Developments Subsequent to Valuation Date. The measure of damages which Moore sought to establish was the market value of Moore's good will as of August 15, 1952. In testifying as to such market value, however, Moore and Dr. Burd were permitted to base their respective opinions in part upon certain events, facts, and business developments occurring subsequent to that date. Appellants contend that this should not have been permitted.
 
 
 179
 We agree. See Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647; City of New York v. Sage, 239 U.S. 57, 36 S.Ct. 25, 60 L.Ed. 143.
 
 
 180
 Opinion Testimony Based on Facts Not in Evidence. We have discussed above the contention that the hypothetical question asked of Dr. Burd was defective, in that it assumed facts not in evidence. Appellants also argue, quite apart from the asserted improper form of the hypothetical question, that Dr. Burd should not have been permitted to premise his answer upon facts which were not in evidence, and many of which were based on hearsay.
 
 
 181
 Dr. Burd testified that, in preparing himself to express an opinion as to market value, he made certain studies and gathered background information from a number of sources. He indicated the nature of these studies and the sources drawn upon.[47] The information gained or findings arrived at in the course of this research were not revealed, however, nor were the source materials which Dr. Burd consulted offered in evidence. On at least one occasion, counsel for Moore sought to have Dr. Burd testify as to the information gained in these pretrial studies. Appellants' objection was sustained, the court instructing the witness: 'You can state if you consider things as a reason for this, but you cannot say what the things are as a factual basis.'
 
 
 182
 It is common practice for a prospective witness, in preparing himself to express an expert opinion, to pursue pretrial studies and investigations of one kind or another. Frequently, the information so gained is hearsay or double hearsay, in so far as the trier of the facts is concerned. This, however, does not necessarily stand in the way of receiving such expert opinion in evidence. It is for the trial court to determine, in the exercise of its discretion, whether the expert's sources of information are sufficiently reliable to warrant reception of the opinion. If the court so finds, the opinion may be expressed. If the opinion is received, the court may, in its discretion, allow the expert to reveal to the jury the information gained during such investigations and studies. Wide latitude in cross-examination should be allowed.[48]
 
 
 183
 Admissibility of Income Tax Returns. Copies of Moore's original income tax returns covering the period 1940 to 1952 were admitted in evidence over appellants' objections.
 
 
 184
 These tax returns, being offered in proof of the facts therein recited, were concededly hearsay. They were not admissible as admissions, because they were offered by the party for whom they were prepared. Nor does the fact that these returns were 'public records' under the internal revenue laws render them admissible. Greenbaum v. United States, 9 Cir., 80 F.2d 113. They are not 'business records,' within the meaning of 28 U.S.C.A. 1732, since not made in furtherance of Moore's business, but at the behest of the Director of Internal Revenue, under sanction of a federal statute. Matthews v. United States, 5 Cir., 217 F.2d 409, 413-414.
 
 
 185
 Moore, however, asserts that they were admissible as summaries of the details of his loose-leaf ledger which was admitted in evidence as Plaintiff's Exhibit 207.
 
 
 186
 Summaries of voluminous records may, in the discretion of the trial judge, be received in evidence Board of County Commissioners v. William J. Howard, Inc., 10 Cir., 230 F.2d 561, 564, certiorari denied,351 U.S. 926, 76 S.Ct. 784, 100 L.Ed. 1456. No case has been cited, however, in which it has been held that income tax returns are admissible on such a theory. While the returns in question undoubtedly contain information drawn from Moore's ledger, they also contain computations which are not reflections of ledger entries. Moreover, the returns were actually offered as primary proof of the income from Moore's business. No testimony was offered, nor statement made, that these returns were being submitted as summaries of Moore's accounting records. In our view, the income tax returns should not have been received in evidence.
 
 
 187
 Admissibility of Ledger and Summary Sheets. Certain of the entries in Moore's ledger, introduced as Plaintiff's Exhibit 207, were not made until several months after the transaction recorded. Mrs. Moore, who kept the ledger, was unable to recall the lapse of time involved in making certain other entries. The business records act provides that memoranda or records, to be admissible, must have been made at the time of the act, transaction, occurrence, or event recorded, or within a reasonable time thereafter. 28 U.S.C.A. 1732. Appellants argue that, in view of this provision, portions of Plaintiff's Exhibit 207 which were not made shortly after the transactions recorded should have been excluded.
 
 
 188
 The entries were based upon cash register tapes, and, in most cases, were posted shortly after the end of each month. There were occasional time lags of several months in posting these entries. There was no evidence to show that this lag introduced inaccuracies or uncertainty as to the reliability of the ledger. The lapse of time was less than involved in United States v. Potson, 7 Cir., 171 F.2d 495, 499, where annual summary sheets were held to be admissible as business records. In our view, the trial court did not err in admitting Plaintiff's Exhibit 207.
 
 
 189
 Certain summary sheets, admitted as separate exhibits, were based upon Moore's income tax returns. Since we have found such returns to be inadmissible, summaries based thereon should not be received at the new trial.
 
 
 190
 Appellants remaining specification of error relates to asserted prejudicial extraneous and coercive influences exerted upon the jury. The circumstances upon which this specification of error is based are not likely to recur at the new trial. It is therefore unnecessary to discuss the point in this opinion.
 
 
 191
 Reversed and remanded with directions to grant appellants a new trial.
 
 
 
 [1]
 Standard Oil Company of California (Standard), Shell Oil Company, Incorporated, a Virginia corporation, The Texas Company (Texas), Richfield Oil Corporation (Richfield), General Petroleum Corporation (General), Tide Water Associated Oil Company (Tide Water), and Union Oil Company (Union). Prior to trial, Shell Oil Company (Shell), a Delaware corporation, which, on September 30, 1949, succeeded Shell Oil Company, Incorporated, was made an additional party defendant. At the close of the trial, the court granted a motion for a directed verdict as to Shell Oil Company, Incorporated, and a judgment of dismissal as to this defendant was entered
 
 
 [2]
 We use the term 'contract' to include the entire contractual arrangement between Tide Water and Moore concerning the supply of petroleum products. Actually, there were five written instruments, including two leases, a petroleum products sales agreement, a merchandise agreement, and a delivery allowance letter, all of which were referred to and canceled in Tide Water's notice to Moore
 
 
 [3]
 The term 'conspiracy' is not used in the complaint. The facts therein alleged, however, are comprehensive enough to encompass conspiracy as well as unlawful agreement or combination. A conspiracy is a joint undertaking having an unlawful purpose, arising out of agreement, and usually extending over a period of time. United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349. See, also, Piquett v. United States, 7 Cir., 81 F.2d 75, 80. The briefs of all parties deal with the question of 'conspiracy' as an issue in the case. Likewise, the trial court instructed fully, and without any objection being interposed, on the meaning of the term 'conspiracy,' and the application of the law of conspiracy to the facts of this case
 
 
 [4]
 In the complaint, 'gasoline' is defined to include diesel fuel
 
 
 [5]
 Self-imposed controls and restrictions pertaining to the refining of gasoline included, according to the complaint, the use of private committees to determine and impose quotas of crude oil to be produced; the purchase of gasoline produced by independent refineries and producers; the use of price-posting systems to fix and maintain uniform and noncompetitive prices to be paid for crude oil purchased from independent companies; the exchanging of crude oil among themselves; and the pooling of transportation facilities
 
 
 [6]
 Self-imposed controls and restrictions pertaining to the distribution of gasoline included, according to the complaint, the use of price leadership and price-posting systems for the purpose of manipulating and stabilizing prices; the exchange of gasoline supplies among appellants; and the sale to retail dealers, for resale under their respective brand names, gasoline actually produced and refined by other appellants. The forms of economic pressure and coercion imposed upon wholesale distributors and retail dealers included, it is alleged, the control and limitation of gasoline supplies, or the cutting off of supplies, of independent wholesale distributors and retail dealers who do not conform to appellants' joint price policies; refusal to permit such distributors and dealers to advertise the type or brand of gasoline sold; utilization of contract forms and other devices which permit appellants to control, adjust, and change retail prices; refusal to sell gasoline to wholesale distributors and retail dealers who will not conform to the joint price policies, or who desire to resell under low cost and cheaper methods of distribution, such as self-service gasoline stations; the artificial decreasing or depressing of gasoline prices, and the creation of so-called 'price wars'; at times the prohibition of the use of 'price signs' by retail dealers, and at other times the insistence that such signs be displayed; the refusal to sell gasoline to dealers who purchase gasoline from any other appellant; the acquisition, operation, and control of retail service stations; and the practice of discriminating between purchasers as to the price of gasoline
 
 
 [7]
 Specifically, it is alleged that appellants concertedly refused to deal with Moore because he would not adhere to appellants' 'artificial price fixing and price maintenance programs.' Another reason attributed to appellants for their asserted concerted refusal to deal was appellants' desire to prefer and favor service station outlets which they individually owned or controlled
 
 
 [8]
 This was the only damage asserted to have resulted from the alleged agreement, combination, or conspiracy. If Moore did not prove such resulting damage, he would not be entitled to judgment, even assuming the existence of an unlawful agreement, combination, or conspiracy between two or more of the appellants. Wolfe v. National Lead Co., 9 Cir., 225 F.2d 427, 432-433, certiorari denied 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802
 
 
 [9]
 Gray testified that he then told Moore that the reason Union could not then take on his account was because the company was then in a condition of 'tight supply.'
 
 
 [10]
 'A. Mr. Martin came into the service station and said that the would--wanted to talk business about selling me gasoline and I said I was willing to buy gasoline. He said that-- he said that they could take the station with 6 cents off of the posted price on the regular grade of gasoline, and 6 1/2 cents off of the posted price of ethyl gasoline, and nine cents on diesel, and that was a sixty-day contract. Then he said, 'We have another plan.' He said, 'We will give you 5 1/2 cents off of the posted price of retail, posted price on regular gasoline, and 6 cents off of the regular posted price on ethyl gasoline, and nine cents on diesel and no paper at all.'
 'So I told him that I would take the one with the 6 cents off and the sixty-day paper and wanted that deal, and I said, 'Let me know right away, because I am getting low on gas.' I didn't have any deliveries of gas. So he said he would let me know.'
 
 
 [11]
 Moore gave this version of how the telephone conversation began:
 '* * * He asked me if I was completely out of gasoline. And I told him I was. He asked me if I had gone to all the companies to try to get gasoline, and I told him that I had, and he said that he didn't like that; that it was a black eye to the industry * * *.'
 
 
 [12]
 Moore, of course, strenuously disputes General's position concerning its 1952 shortages and resulting restriction upon the taking of new accounts. The sufficiency of the evidence to support a jury finding in Moore's favor on this point is not relevant to our present inquiry, which concerns refusal to deal regardless of reasons. The reasons for refusal, however, do become relevant on the question of the sufficiency of the evidence to support the jury finding of unlawful agreement, combination, or conspiracy. To avoid the necessity of again discussing this factual situation when we come to a discussion of the latter point, we state now that, in our opinion, the matter of General's 1952 gasoline shortages was sufficiently in dispute to present a jury question
 
 
 [13]
 In any event, the evidence was sufficient to support a jury finding that interstate trade and commerce was involved. See Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239
 
 
 [14]
 A 'split-pump' account is one in which the service station operator is permitted to sell the gasoline of two or more oil companies
 
 
 [15]
 Where a service station operator desired to change from one oil company to the other, the latter company's inquiry of the former as to whether the operator was contractually free to deal with the new company was called a request for 'clearance.'
 
 
 [16]
 The trial lasted over three months. There were 72 witnesses, whose testimony required 20 volumes of printed record comprising 7,701 pages. There are 1,088 exhibits. According to the clerk of the district court, the record is the longest in any civil case ever appealed to this court from the Western District of Washington. It required more trial days than four of the five big antitrust cases brought by the United States in 1949 (13 F.R.D. 64). Including exhibits, the record compares in size with the government's famous Standard Oil case in 1911, which involved every phase of virtually the entire petroleum industry of the United States. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619. One and a half days were allotted for oral argument before this court
 
 
 [17]
 After 1947, Moore had refused to give Tide Water a financial statement. Moore testified that he refused to give Tide Water such statements because it would jeopardize his bargaining position when it came time to renew his contract if Tide Water knew how well he had been doing
 
 
 [18]
 Richfield, Union, and, to some extent, Tide Water had fair trade clauses in their respective contracts with retail dealers. Under the 1937 Miller-Tydings amendment of the Sherman Act (15 U.S.C.A. 1), and under chapter 19.88 of the Revised Code of Washington, a manufacturer may fix the minimum resale price of a trade-marked article. The practice is called 'fair trading.' Except for the period between the decision in Schwegmann Bros. v. Calvert Distilleries Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, on May 21, 1951, and the enactment of the McGuire Act on July 14, 1952 (66 Stat. 631, 632; 15 U.S.C.A. 45), this minimum price is and was binding on dealers whether or not they signed an agreement to observe it. There may be circumstances, however, under which such agreements are illegal because of the existence of competition between the supplier and the retail dealer it supplies, for the business of certain ultimate consumers, (see Esso Standard Oil Co., v. Secatore's Inc., 1 Cir., 246 F.2d 17, certiorari denied 78 U.S. 54), or for other reasons. See Report of the Attorney General's National Committee to Study the Antitrust Laws, March 31, 1955, 152-153
 
 
 [19]
 The evidence favorable to Moore would not support a finding that it was the general practice of appellants to deny petroleum products to all price-cutting service stations. In the Seattle area, there have always been price-cutting service stations supplied by appellants. Moore, who was himself a price cutter for thirteen years, was supplied by Tide Water until July 30, 1952. Tide Water at all times knew of Moore's price-cutting activities
 
 
 [20]
 When Markov first commenced business in November, 1949, however, Shell attempted to obtain his account despite the existence of its adjacent station
 
 
 [21]
 In attempting to prove the existence of a combination or conspiracy during a particular span of years, it is permissible to show the relationship existing and practices followed during earlier years. American Tobacco Co. v. United States, 328 U.S. 781, 790, 66 S.Ct. 1125, 90 L.Ed. 1575
 
 
 [22]
 In achieving this uniformity, an appellant whose prices were high would frequently lower its prices to accord with the posted price schedule of other appellants. But with respect to at least one appellant (Texas), 'meeting competition' meant not only lowering prices to parallel a lower price posted by others, but also the raising of prices to produce such uniformity. In the case of Richfield, Texas, and Union, supervising officers sometimes requested local representatives to check the posted price schedule of competition. As to each such company, local representatives were also occasionally advised of information gained by the supervising office as a result of its own check of posted price schedules
 
 
 [23]
 See, also, Interstate Circuit v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 83 L.Ed. 610; Flintkote Co. v. Lysfjord, 9 Cir., 246 F.2d 368, certiorari denied 78 U.S. 54
 
 
 [24]
 This rule does not deal with the testimony of members of such an arrangement, or of their agents and employees, but only with independent evidence of facts and extrajudicial declarations. Where such a member, agent, or employee does testify, independent evidence of acts and extrajudicial declarations is admissible for purposes of contradiction. See 2 Restatement, Agency, 642, 285, comment a
 
 
 [25]
 See, also, Report of the Attorney General's National Committee, supra, 36-40
 
 
 [26]
 For the same reasons, the verdict is not sustainable as against Tide Water on the theory (which may or may not have factual support in the record) that Tide Water participated in an agreement, combination, or conspiracy with other service station operators who were in competition with Moore
 
 
 [27]
 Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951; Millinery Creators' Guild, Inc., v. Federal Trade Commission, 312 U.S. 469, 61 S.Ct. 708, 85 L.Ed. 955; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949
 
 
 [28]
 Fashion Originators' Guild v. Federal Trade Commission, supra; Report of the Attorney General's National Committee, supra, 133
 
 
 [29]
 As apparently recognized by all concerned, most of these exhibits constituted hearsay, since substantially all of them were offered to prove the truth of the contents, and were not subject to the test of cross-examination. See Palmer v. Hoffman, 318 U.S. 109, 112, 63 S.Ct. 477, 87 L.Ed. 645; 5 Wigmore, Evidence (3d ed., 1940) 3, 376, 1367, 1530
 
 
 [30]
 28 U.S.C.A. 1732, subd. (a) of which reads as follows:
 '(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.
 'All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.
 'The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind.'
 
 
 [31]
 See, for example, Medina v. Erickson, 9 Cir., 226 F.2d 475, 482, certiorari denied 351 U.S. 912, 76 S.Ct. 702, 100 L.Ed. 1446 (doctors' consulation reports, made in accordance with hospital regulations); Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 183 F.2d 467, 473 (report of U.S. Bureau of Mines concerning explosion); Pekelis v. Transcontimental & Western Air, Inc., 2 Cir., 187 F.2d 122, 23 A.L.R.2d 1349, certiorari denied 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (report of company accident investigation board). But see Chapman v. United States, 5 Cir., 194 F.2d 974, 978, certiorari denied 344 U.S. 821, 73 S.Ct. 19, 97 L.Ed. 639, criticizing the Pekelis and Moran decisions
 
 
 [32]
 See, also, Gencarella v. Fyfe, 1 Cir., 171 F.2d 419; Clanios v. United States, 82 U.S.App.D.C. 278, 163 F.2d 593. Contra: Pollack v. Metropolitan Life Ins. Co., 3 Cir., 138 F.2d 123, 129; United States v. General Motors Corp., 7 Cir., 121 F.2d 376, 409, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497
 
 
 [33]
 Perhaps the most extreme example of this kind is plaintiff's exhibit 6-B. It is a report by an undentified salesman named 'Art' to Union's local manager, about a Tide Water dealer. Received as a business record of Union, it reads in part:
 'Mr. Chris Pieren, Associated dealer at 7120 East Marginal Way told me today that Associated has removed off policy discounts from their self-serve dealers and has discontinued selling to them unless they raise their posted price to the regular retail level.
 'Bill Scholdt, operator of Bill's Gas Well at 10300 East Marginal Way, said the Harris Petroleum had been approached by two Associated Self-Serve dealers formerly supplied by them for their further supply since Associated was going to take away their discount. * * *'
 
 
 [34]
 The existence of a document or its presence in the file of a corporation does not, without more, render it admissible under 1732. National Labor Relations Bd. v. Sharples Chemicals, Inc., 6 Cir., 209 F.2d 645. That the company procedures must provide for systematic or routine entry of such records, see Palmer v. Hoffman, supra; New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297, 303; Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co., 2 Cir., 18 F.2d 934; 5 Wigmore, Evidence (3d ed. 1940) 373, 1525. The requirement that the procedure call for timely entry of such records is expressly spelled out in 1732(a) in these words: '* * * and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.'
 
 
 [35]
 It is not suggested that the writings were inadmissible because they were in the form of memoranda or letters. It is expressly provided in 1732 that writings which meet the requirements of that statute are admissible 'whether in the form of an entry in a book or otherwise.' Thus, informal memoranda, prepared for the purpose of recording company acts, transactions, occurrences, or events, dictated as a regular company practice within a reasonable time afterwards, would be admissible as records made in the regular order of business. See Smith v. Bear. 2 Cir., 237 F.2d 79
 
 
 [36]
 Some of these exhibits which were admitted to establish the truth of the recitals therein contained (and so were hearsay) may also be admissible on a new trial for limited and nonhearsay purposes, such as to show the orders of a superior, pattern of business conduct, contemporary explanations of ambiguous conduct, notice, or motive. In this event, it would not be necessary to qualify them as business records, extrajudicial admissions, or under any other exception to the hearsay rule
 
 
 [37]
 There is one possible exception to what has just been said. This concerns Plaintiff's Exhibits 28-A, 28-C, 29-E, and 32-A. The witness who gave the additional testimony concerning these exhibits testified that they had been prepared in Associated's San Francisco office, and that he had no knowledge of the procedure followed. Conceding that, as to these exhibits, a foundation for their admission as business records had not been established, counsel for appellee reoffered them only as against Associated, and on the theory that they were admissions. We have failed to find, in this voluminous record, where this reoffer of these exhibits was acted upon
 
 
 [38]
 See Shepard v. United States, 290 U.S. 96, 103, 54 S.Ct. 22, 78 L.Ed. 196; 1 Wigmore, Evidence (3d ed. 1940), 320, note 14
 
 
 [39]
 Where a document is not admissible as a memorandum or record made in the regular course of business, its authenticity and genuineness must be established in accordance with familiar rules pertaining to the authentication of private writings in general. See the cases cited in 32 C.J.S. Evidence 706, p. 606 et seq
 
 
 [40]
 For a discussion of the distinction between extrajudicial admissions and statements of fact against interest, see 4 Wigmore, Evidence (3d ed. 1940) 6, 1049; McCormick, Evidence (1954) 502, 239, 546, 253
 
 
 [41]
 Restatement, Agency, 286
 
 
 [42]
 Lever Bros. Co. v. Atlas Assurance Co., 7 Cir., 131 F.2d 770; Restatement, Agency, 287; Morgan, The Law of Evidence, 1941-1945, 59 Harv.L.Rev. 481, 559; Morgan, The Rationale of Vicarious Admissions, 42 Harv.L.Rev. 461, et seq.; Mechem, Agency (2d ed. 1914) 1784
 
 
 [43]
 See Mayola v. United States, 9 Cir., 71 F.2d 65, 67; Oras v. United States, 9 Cir., 67 F.2d 463, 466. See, also, the general discussion of the order of proof and the so-called 'rule of convenience,' in Flintkote Company v. Lysfjord, supra. (246 F.2d 379.)
 
 
 [44]
 Moore retains his life expectancy and business acumen. Assuming that he is entitled to, and so receives, the market value of the destroyed good will of his business, he can, at least theoretically, do as well with it as he could have done by continuing in business at his Fourth Avenue South location
 
 
 [45]
 Berndt v. Dept. of Labor and Industries, 44 Wash.2d 138, 148, 265 P.2d 1037, 1043; Starr v. Oriole Cafeterias, 182 Md. 214, 34 A.2d 335. Conversely, such a question need not include every fact in the case. Rowe v. Pennsylvania Greyhound Lines, 2 Cir., 231 F.2d 922, 925, certiorari denied, 351 U.S 984, 76 S.Ct. 1052, 100 L.Ed. 1498
 
 
 [46]
 It should not be understood, from the foregoing discussion, the it is always necessary to propound a hypothetical question in eliciting the opinion of an expert. The present trend of thinking is that the use of hypothetical questions is not required except in the discretion of the trial judge. See Uniform Rules of Evidence, Rule 58; Uniform Act on Expert Testimony, 9; McCormick on Evidence (1954) 34, 16
 
 
 [47]
 (1) History of Moore's station from 1940 to July, 1952, the information being supplied by Moore; (2) retail gasoline business in Seattle as disclosed in published data for the nation as a whole; (3) general economic and business conditions, as reported in materials available in public library; (4) general business conditions from July, 1952, to 1955, based on Dr. Burd's personal study; (5) flow of traffic on Fourth Avenue South, shown by Seattle traffic surveys; (6) business performance of other gasoline stations in areas since Moore went out of business, shown by Dr. Burd's personal observations; (7) data concerning gasoline stations in Seattle, taken from United States Census of Business; (8) gasoline prices from 1952 to 1955, revealed by Dr. Burd's research; (9) competitive conditions in the area of Moore's station from 1952 to 1955, as determined by investigations made by Dr. Burd; (10) service station operating problems learned by Dr. Burd as a result of discussions with a representative of Time Oil Company, and with a Richfield and a Standard dealer; and (11) business conditions in the Fourth Avenue South area, known to Dr. Burd because of his familiarity with the area
 
 
 [48]
 See District of Columbia Redevelopment Land Agency v. 61 Parcels of Land, 98 U.S.App.D.C. 367, 235 F.2d 864; Gwathmey v. United States, 5 Cir., 215 F.2d 148; United States v. 5139.5 Acres of Land, 4 Cir., 200 F.2d 659. Some of the sources drawn upon by Dr. Burd, as summarized in the last footnote, are objectionable because they pertain to events occurring since the critical date of August 15, 1952. The witness should have been directed to exclude such considerations in arriving at his opinion